633 A.2d 479

## MAYOR AND COUNCIL OF ROCKVILLE

v.

**Thomas J. WALKER, Jr., Substitute Trustee.**

**No. 189, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Dec. 3, 1993.

Roger W. Titus (Paula T. Laboy and Venable, Baetjer and Howard, on the brief), Rockville, for appellant.

Albert D. Brault (Janet S. Zigler, James M. Brault and Brault, Graham, Scott & Brault, on the brief), Rockville, for appellee.

Argued before GARRITY, WENNER and MOTZ, JJ.

WENNER, Judge.

This appeal has its genesis in an agreement (the Agreement) between the Mayor and Council of Rockville (the City)

and New Rockville Town Center Partners (the Developer)[1] for the sale and development of a portion of the City's "Mid-City Urban Renewal Project." The Agreement, and later a deed from the City to the Developer, gave the City the right to re-enter the property, terminate the Developer's interest, and revest title to the property in the City if the Developer defaulted on the Agreement. The Developer subsequently defaulted, the City re-entered, and we found in *Hadid Land Development Corp. v. Mayor and Council of Rockville*, No. 88–1339 (Md.Ct.Spec.App. May 16, 1988) that the City's re-entry was valid.

In *Mayor and Council of Rockville v. Walker*, 86 Md.App. 691, 587 A.2d 1179 (1991) (*Rockville I*), we held that a deed of trust granted to Thomas J. Walker, Jr., substituted trustee, as security for a loan from Equitable Federal Savings Bank[2] to the Developer subsequent to the Developer's deed from the City, was extinguished by the City's re-entry unless Equitable's secured loan to the Developer was authorized by the Agreement. The City's right to re-enter was specifically "subject to any rights or interests provided in Article VI of [the] Agreement for the protection of mortgage holders." Since there was an inadequate basis on which to determine whether Equitable's secured loan to the Developer was authorized[3] by the Agreement, however, we remanded the case to

---

1. New Rockville Town Center Partners later assigned its rights and obligations under the Agreement, to Rockville Town Center Hotel Limited Partnership. We shall collectively refer to them as "the Developer."

2. Walker and Equitable Federal Savings Bank will be collectively referred to as "Equitable."

3. As explained below, the provisions of Article VI of the Agreement require that notice of default be given to holders of "authorized mortgages" and upon the giving of such notice, the holders of "authorized mortgages" acquire certain rights. Thus, the questions of whether a mortgage is authorized, and whether a mortgage holder possesses rights under Article VI so as to become a third party beneficiary and attain priority over the City's right of re-entry are synonymous. To be consistent and concise, we shall refer to the status of having rights

the Circuit Court for Montgomery County for an evidentiary hearing on that issue. On remand, the circuit court held that Equitable's secured loan to the Developer was authorized by the Agreement and thus survived the City's re-entry, and that Equitable could proceed with its foreclosure of the deed of trust securing its loan to the Developer. This appeal followed.

On appeal, the City asserts that the circuit court erred in determining that Equitable's secured loan to the Developer was authorized by the Agreement. For the reasons we will explain, we agree with the City and shall reverse the judgment of the circuit court.

**I.**

Section 6.01 of Article VI of the Agreement establishes restrictions on the amounts and purposes of financing permitted and requires that notice of any proposed financing be given to the City. This restriction is imposed entirely upon the Developer. In *Rockville I*, the City argued that the requirements of § 6.01 were not satisfied and that as Equitable's loan to the Developer was therefore not authorized, it did not survive the City's re-entry. With respect to Equitable's responsibility, the City contended that:

Equitable was on constructive notice of the existence of the provisions of Section 6.01 in that the Agreement was recorded in the land records one month prior to its loan and Deed of Trust to the Developer. If Equitable, in the exercise of proper diligence, wished to satisfy the requirements of Section 6.01 and be assured that the loan was a proper loan that would survive any default by the Developer under the Deed and Indenture, Equitable should have obtained or required that the Developer obtain necessary assurances, in writing, from the City in order to claim any third party benefit under the Agreement. If Equitable now seeks to obtain the benefits provided to lenders that make certain

under Article VI of the Agreement as holding an "authorized" mortgage.

limited types of loans permissible under the Agreement ... it was required to see that the terms of the contract governing the placement of the loan were being properly followed, that is, that notice be first given to the City prior to the placement of the loan.

This contention then underwent somewhat of a transformation, so that, by the end of its brief, the City was arguing that *Equitable* was responsible for giving it the notice required by Section 6.01 of Article VI of the Agreement:

Moreover, Equitable is estopped from asserting or relying on the Agreement in an attempt to enforce its Deed of Trust against the property of the City in light of the failure to comply with the Agreement by not notifying the City and obtaining assurances from the City as to the placement of the subject Deed of Trust on the property.

We properly rejected the City's final contention, explaining that:

... The Agreement specifically states that '[t]he *Developer* shall notify the City...." Nowhere in the Agreement does it indicate that the lender also is obliged to notify the City and we have no power to re-write the Agreement. If the City required the lender to notify it as well as the Developer, then the City should have included a provision to that effect in the Agreement.

*Rockville I,* 86 Md.App. at 704, 587 A.2d 1179.

We then remanded the case to the trial court to determine whether Equitable's secured loan to the Developer was authorized by the Agreement:

We think that the trial court discussed the question of whether the loan was *authorized* under the Agreement without sufficient evidence in the record for it to do so. Consequently, we remand for an evidentiary hearing to determine whether appellee [Equitable] complied with the provisions of Article VI when it loaned the Developer the $900,000. If appellee failed to comply with the provisions of

Article VI, then appellee's interest will be subordinate to that of the City, *i.e.*, title will revest in the City. . . .

*Id.* at 703, 587 A.2d 1179 (emphasis added).

It appears that the phrasing of our remand instructions (that is, compliance with the provisions of Article VI), in light of our holding regarding Equitable's responsibility for notice, has, to our regret, caused some confusion. The issue to be resolved was "whether the loan was authorized under the Agreement." We intended our remand instructions to determine "whether appellee [Equitable] complied with the provisions of Article VI" to be read in the context of Equitable's position as a third party beneficiary. As we shall discuss *infra*, compliance on Equitable's part thus would require participating only in an authorized loan.[4]

Instead, read literally, the instructions apparently could be and have been interpreted to preclude notice to the City as part of the "authorization issue." The trial judge clearly held this view, and felt constrained by what he believed to be our holding in *Rockville I:*

The case is on remand from the Court of Special Appeals, and so I do not write on a clean slate. I am dealing with an opinion by that Court I might say right or wrong.

Now, let me say I am not altogether certain I would have decided this case the way the Court of Special Appeals did when it came to the issue of notice nor would I have—and I would be I think concerned about the extent to which a third-party beneficiary might in fact have to stand in the shoes of a promisee of an agreement and be bound by whatever defenses are available against that promisee.

That is somewhat related to the collateral estoppel agreement, but not entirely dependent on it. As I understand what the Court of Special Appeals has said here, they have made it clear that the—with regard to the issue of notice to

---

**4.** At this point, we note that the concept of Equitable's "compliance" with the specific terms of the Agreement is a fiction, as it is undisputed that Equitable had no actual knowledge of the terms of the Agreement at the time its loan to the Developer was either approved or closed.

the City there was no requirement of the lender notifying the City, and therefore apparently they are making a distinction between whatever rights the lender might have and the developer might have.

They could have easily said, well, the lender didn't have an obligation to notify the City, but the developer did. The lender derives from the developer, and therefore the lender loses, but they didn't say that.

So, we have to live with that in this case, and I won't say anything more about that on this point.

Unfortunately, when read thusly, our remand instructions and our holding with respect to notice together imply that if only the loan amount and purpose limitations of Section 6.01 were complied with, Equitable's secured loan to the Developer was authorized by the Agreement. This is not what we intended.

It is beyond cavil that the holder of a mortgage may be a third party beneficiary under the Agreement. Section 9.09 reads:

It is the intent of the parties to this Agreement to create rights and benefits for the benefit of the parties named herein and for certain mortgage holders and not for any other persons. Accordingly, the parties disclaim any intent whatsoever to create any third party beneficiary rights by their execution of this Agreement, except those specifically granted to mortgage holders in Article VI of this Agreement.

Section 3.10 of the Agreement further provides that the City's right of re-entry upon the default of the Developer is "subject to any rights or interests provided in Article VI of this Agreement for the protection of mortgage holders."

Even so, though potentially a third party beneficiary, the responsibility for compliance with the requirements of Section 6.01 cannot properly be placed upon the mortgage holder. The Agreement is between the Developer and the City. Although a third party may benefit from the Agreement, it does not bind the third party to performance. This is not to say,

however, that, before relying upon its position as a third party beneficiary, it would not be incumbent upon a mortgage holder to ensure or verify that the terms of the Agreement have been met. First, the Agreement specifically excludes any third party rights other than those created by Article VI. Second, it is axiomatic that a promisor may raise any defense against a third party beneficiary that it could have raised against the promisee. *Three Garden Village Ltd Partnership v. United States Fidelity & Guaranty Co.*, 318 Md. 98, 116, 567 A.2d 85 (1989) (citing *Shillman v. Hobstetter*, 249 Md. 678, 690, 241 A.2d 570 (1968)). If, to ensure the protected status accorded by the Agreement to an authorized mortgage holder, the mortgage holder, rather than the Developer, has satisfied the Agreement's requirements for priority, we would not deny that status to the mortgage holder. Nonetheless, we cannot conclude that a mortgage is an authorized mortgage when only some, but not all, of the requirements for that status contained in the Agreement are met.

## II.

The Agreement sets out a comprehensive framework establishing the rights of the City and of mortgage holders and their relations to one another in the event the Developer defaults on its obligations to either of them. Article VI of the Agreement is captioned "Mortgage Financing; Rights of Mortgage Holders." Section 6.01 provides that the Developer shall place no encumbrances on the property "except for the purpose of obtaining (i) funds only to the extent necessary for making improvements on such Parcel and (ii) such additional funds, if any, in an amount not to exceed the purchase price, if any, paid by the Developer to the City for the Parcel." Additionally, Section 6.01 requires that

[t]he Developer shall notify the City in advance of any financing, secured by mortgage or similar lien instrument, it proposes to enter into with respect to such Parcel, and shall promptly notify the City of any encumbrance or lien that has been created on or attached to the Parcel, whether by

voluntary act of the Developer, or otherwise, of which the Developer has notice.

Section 6.03 provides that, should the City deliver notice or demand to the Developer with respect to a breach or default under the Agreement,

the City shall at the same time forward a copy of such notice or demand to each holder of any mortgage authorized by this Agreement at the last address of such holder shown in the records of the City.

Section 6.04 provides that, "[a]fter any breach or default referred to in Section 6.03," whereby both the developer and authorized mortgage holders are given notice,

each mortgage holder shall have the right, at its option, to cure or remedy such breach or default and to add the cost thereof to the mortgage debt and the lien of its mortgage,

except that the mortgage holder may not undertake construction unless it expressly assumes the obligations of the Agreement. Section 6.02 provides that although

the holder of any mortgage authorized by this Agreement ... shall not be obligated by the provisions of this Agreement to complete the improvements on such Parcel or to guarantee such completion,

the mortgage holder is subject to the restrictions on use of the property established by the Urban Renewal Plan and the Agreement.

While Article VI establishes the rights of the holder of an "authorized mortgage" should the Developer default on the Agreement, Sections 3.08 and 3.09 establish the City's rights should the Developer default on a mortgage secured by the property. Section 3.08 gives the City the right, at its option, to cure a "default by the Developer under any mortgage, which default gives rise to a right in the holder thereof to assume possession" of a parcel transferred to the Developer by virtue of the Agreement.

Section 3.09 provides that if, following the Developer's default under the Agreement, a mortgage holder has the

option to construct or complete the improvements, but does not exercise that right, or upon exercising that right fails to complete the improvements, the City shall have the option either of paying the balance due on the mortgage and receiving an assignment of the mortgage, or, if the mortgage holder has acquired title to the property through foreclosure, paying the balance due on the mortgage, as well as accrued costs and expenses, and receiving a reconveyance of the property. Sections 3.08 and 3.09 each require the Developer to see that the City's rights are contained in any mortgage affecting property transferred to the Developer under the Agreement.[5]

### III.

■ When interpreting a contract, we are to give effect and meaning to all of its provisions unless such an interpretation is unreasonable. *DeLeon Enterprises, Inc. v. Zaino*, 92 Md.App. 399, 407, 608 A.2d 828 (1992) (citing *Orkin v. Jacobson*, 274 Md. 124, 130, 332 A.2d 901 (1975)); *Arundel Federal Savings & Loan Association v. Lawrence*, 65 Md.App. 158, 165–66, 499 A.2d 1298 (1985). The trial judge has interpreted our holding in *Rockville I* that the deed of trust securing Equitable's loan cannot be found to be unauthorized because *Equitable* failed to give the City notice, also to mean that the deed of trust cannot be found to be unauthorized because the *Developer* failed to give the City notice. The result is that Section 6.01's notice clause has been nullified.

■ It is apparent, however, that the notice clause of Section 6.01 serves an important function. Section 6.03 entitles the holder of an authorized mortgage to be notified of any

---

**5.** That these rights are not expressed in terms of an "authorized mortgage," is not inconsistent with Article VI. The City reserved its rights against all mortgagees, while granting the rights provided in Article VI only to holders of authorized mortgages. The option to have a mortgage declared unauthorized and therefore subordinate to the City's rights under the Agreement is not foreclosed by the City's reservation of other optional rights regarding the mortgage. Moreover, it is possible that the failure to incorporate the provisions required in Sections 3.08 and 3.09 could itself render the mortgage unauthorized.

notice of default or demand delivered to the Developer by the City. It is a default referred to in Section 6.03, that is, a *default of which it has been given notice under that section,* that triggers the right of the holder of an authorized mortgage to cure the Developer's default granted it by Section 6.04.[6] The Developer's failure to notify the City of a mortgage placed on the property might, at the least, prevent the City from complying with its obligation under the Agreement to notify an authorized mortgage holder of the Developer's default. Moreover, failure to comply with the Agreement's requirement that the City be given *advance* notice of proposed financing deprives the City of the opportunity to ensure that the provisions required by Sections 3.08 and 3.09 are contained in the mortgage. In addition, the City would be deprived of an opportunity to request that the mortgage holder notify the City of any action it might institute with respect to the secured property, and generally to monitor the status of an encumbrance that might affect the City's interest in the property.[7]

## IV.

The City asserts that the trial judge erred in determining that the deed of trust complied with the provisions of Article VI because:

---

**6.** In its brief, Equitable asserts that as it received notice of the Developer's default, the City must have considered it to be the holder of an authorized mortgage. Although the record confirms Equitable's knowledge of the Developer's default, it does not appear to establish the source of its knowledge. Assuming, *arguendo,* that the City notified Equitable of the Developer's default, the mere giving of notice does not, under the Agreement, establish one as a holder of an authorized mortgage. That Equitable was given notice does not mean that it was *entitled* to notice.

**7.** Had Equitable's action of foreclosure been brought before the City re-entered, the purpose of the notice clause and the impact of noncompliance on the City might have been quite evident. The Developer's failure to have the provisions of Sections 3.08 and 3.09 incorporated in the deed of trust securing Equitable's loan, combined with lack of notice to the City, could likely have resulted in the City being completely unaware of the foreclosure and thus not able adequately to protect its interests.

1. [Equitable's] attorney knew of, but made no effort to comply with, the requirements of the agreement;

2. The loan was merely a land loan with no required purpose or disbursement mechanism that would provide funds for, and assure completion of, construction of improvements;

3. The loan was not for the full amount of financing necessary to complete the improvements as required by Section 2.01(c) (as amended);

4. The loan was for a period of less than five (5) years in violation of Sections 1.01(j), 2.01(c) (as amended) and 2.06(b);

5. The loan did not contain any provision authorizing the City to cure a default by the Developer as required by Section 3.08; and

6. Neither [Equitable] nor the Developer gave notice to, or obtained the approval of, the City prior to making the loan or placing a lien on the property, in violation of Sections 2.01(c) (as amended), 2.06(b) and 6.01.

■ As we have explained, whether Equitable was aware of the terms of the Agreement is irrelevant to determining whether the deed of trust securing its loan to the Developer was authorized, except that if Equitable had been aware, it may have been able to monitor the Developer's compliance with the Agreement. We shall not disturb the trial judge's findings of fact with respect to many of the remaining items. Specifically, the trial judge determined that the amount and purpose of the loan secured by the deed of trust met the criteria of Section 6.01. Moreover, he determined that Equitable's so-called "bridge loan" was not prohibited by the Agreement and that, as the requirements of Sections 2.01(c), 1.01(j), and 2.06(b) concerned only "financing for the full amount of construction and interim financing," those provisions did not apply to Equitable's loan.[8]

---

8. These provisions were originally drawn, in a fashion similar to the Department of Housing and Urban Development's redevelopment con-

Because we find Section 6.01's requirement of notice to be determinative of this appeal, we need not reach the issue of whether the failure to incorporate the clauses required by Sections 3.08 and 3.09 cause the deed of trust securing Equitable's loan to the Developer to be unauthorized.

 Based upon his findings, and with the caveat "this is all subject to my general observation that I am bound by what the Court of Special Appeals has said on the issue of notice," the trial judge entered a judgment in favor of Equitable, but, as he put it, "just barely." As we have noted, however, the trial judge's interpretation of our mandate in *Rockville I* resulted in an improper bifurcation of the requirements of Section 6.01. Reading that section in its entirety and in the context of the entire Agreement, we think it clear that the notice requirement is as significant as are the loan amount and purpose limitations contained in the Agreement. As it is undisputed that the City was not given notice, we conclude that the deed of trust securing Equitable's loan to the Developer was unauthorized.

To hold otherwise would reward the Developer's disregard of, and Equitable's blindness to, the terms of the Agreement. The City reserved in the Agreement the right of re-entry to protect its interest in the property and to ensure that the Developer complied with the Agreement. The Agreement was placed on record and is incorporated by reference into the City's deed to the Developer. In order to facilitate the

---

tracts, to require the Developer to obtain, subject to the City's approval, a commitment for "the full amount of construction and interim financing for a period of no less than five (5) years" *before* the City would transfer title to the property to the Developer.

Inasmuch as the City's earlier attempts to develop its "Mid–City Urban Renewal Project" had fared poorly, and because of the Developer's avowed finances, and his ability to purchase the property from the City for cash and proceed promptly with the project, the City waived the deadlines established by these Sections and transferred title to the property to the Developer before the Developer obtained the required commitment. The fact that the City abandoned the HUD framework in that respect has no effect upon the provisions of Article VI, which, by its terms, applies to *any* secured loan affecting the transferred property.

Developer's ability to obtain financing, the Agreement grants certain mortgage holders rights as third party beneficiaries and specifies the conditions under which such rights will arise. One of these conditions was that the City be given advance notice of any proposed secured financing. Thus, the notice requirement was obviously designed to benefit and protect both the City and a mortgage holder.

As the City was not given the required notice, the conditions of Section 6.01 were not met and the deed of trust securing Equitable's loan to the Developer was unauthorized. Because it was not authorized, Equitable acquired neither a right to receive notice of the Developer's default nor a right to cure it. Since Equitable had no rights under Article VI, neither the third party beneficiary status of Section 9.09 nor the subordination clause of Section 3.10 are here applicable. Consequently, we hold that the deed of trust securing Equitable's loan to the Developer was subordinate to the City's right of re-entry and terminated upon the City's re-entry.

**JUDGMENT REVERSED.**

**COSTS TO BE PAID BY APPELLEE.**