640 A.2d 751

MAYOR AND COUNCIL OF ROCKVILLE

v.

Thomas J. WALKER, Jr., Substitute Trustee.

No. 189, Sept. Term, 1993.

Court of Special Appeals of Maryland.

May 6, 1994.

Roger W. Titus (Paula T. Laboy and Venable, Baetjer and Howard, on the brief), Rockville, for appellant.

Albert D. Brault (Janet S. Zigler, James M. Brault and Brault, Graham, Scott & Brault, on the brief), Rockville, for appellee.

Argued before GARRITY, WENNER and MOTZ, JJ.

MOTZ, Judge.

On December 3, 1993, we issued our initial opinion in this appeal, *Mayor and Council of Rockville v. Walker,* 98 Md. App. 398, 633 A.2d 479 (1993) (*Rockville II* ). Shortly thereafter, appellee, Thomas J. Walker, Jr., Substitute Trustee for Equitable Federal Savings Bank (collectively, "Equitable") filed a motion for reconsideration. After consideration of that motion and the response to it, for the reasons set forth within, we have concluded that the motion has merit. Accordingly, we grant the motion, withdraw our initial opinion, and issue the following opinion in its place.

(i)

This appeal has its genesis in an agreement (the Agreement) between the Mayor and Council of Rockville (the City) and New Rockville Town Center Partners (the Developer)[1] for the sale and development of a portion of the City's "Mid–City Urban Renewal Project." The Agreement, and later a deed from the City to the Developer, gave the City the right to re-enter the property, terminate the Developer's interest, and revest title to the property in the City if the Developer defaulted on the Agreement. The Developer subsequently defaulted, the City re-entered, and we found, in *Hadid Land Development Corp. v. Mayor and Council of Rockville*, No. 88–1339 (Md.Ct.Spec.App. May 16, 1988), that the City's re-entry was valid.

In *Mayor and Council of Rockville v. Walker*, 86 Md.App. 691, 587 A.2d 1179 (1991) (*Rockville I* ), we held that a deed of trust granted by the Developer to Equitable subsequent to the Developer's deed from the City was extinguished by the City's re-entry unless Equitable's secured loan to the Developer was authorized by the Agreement. The City's right to re-enter was specifically "subject to any rights or interests provided in Article VI of [the] Agreement for the protection of mortgage holders." *Id.* at 702, 587 A.2d 1179. Since there was an inadequate basis on which to determine whether Equitable's secured loan to the Developer was authorized by the Agreement, however, we remanded the case to the Circuit Court for Montgomery County for an evidentiary hearing on that issue. *Id.* at 703–04, 587 A.2d 1179. On remand, the circuit court held that Equitable's secured loan to the Developer was authorized by the Agreement and thus survived the City's re-entry and, therefore, that Equitable could proceed with its foreclosure of the deed of trust securing its loan to the Developer. This appeal followed.

---

1. New Rockville Town Center Partners later assigned its rights and obligations under the Agreement, to Rockville Town Center Hotel Limited Partnership.

On appeal, the City asserts that the circuit court erred in determining that Equitable's secured loan to the Developer was authorized by the Agreement, for the following reasons:

1. The Bank's attorney knew of, but made no effort to comply with, the requirements of the Agreement;

2. The loan was merely a land loan with no required purpose or disbursement mechanism that would provide funds for, and assure completion of, construction of improvements;

3. The loan was not for the full amount of financing necessary to complete the improvements as required by Section 2.01(c);

4. The loan was for a period of less than five (5) years in violation of Sections 1.01(j), 2.01(c) [as amended] and 2.06(b);

5. The loan did not contain any provision authorizing the City to cure a default by the Developer as required by Section 3.08; and

6. Neither the Bank nor the Developer gave notice to, or obtained the approval of the City, prior to making the loan or placing a lien on the property, in violation of Sections 2.01(c) [as amended], 2.06(b) and 6.01.

### (ii)

In our December 3, 1993 opinion, we devoted most of our attention to the last of these issues. *Rockville II,* 98 Md.App. at 401–08, 410–11, 633 A.2d 479. We concluded that Equitable did not obtain the rights of a third party beneficiary of the Agreement between the City and the Developer because the failure to provide notice of the Equitable financing to the City meant that Equitable's deed of trust was not an authorized lien under Article VI of the Agreement. *Id.* at 411, 633 A.2d 479. Equitable filed a motion urging reconsideration of this holding on two grounds: (1) it "violated the law of the case doctrine" and (2) it was wrong on the merits. We need not determine if our holding violated law of the case principles

because, on reflection, we believe we were wrong on the merits.

The Agreement sets out a comprehensive framework establishing the rights of the City and of mortgage holders and their relations to one another in the event the Developer defaults on its obligations to either of them. Article VI of the Agreement is captioned "Mortgage Financing; Rights of Mortgage Holders." Section 6.01 provides that the Developer "shall not engage in any financing or any other transaction creating any mortgage ... except for the purpose of obtaining (i) funds only to the extent necessary for making improvements on such Parcel and (ii) such additional funds, if any, in an amount not to exceed the purchase price, if any, paid by the Developer to the City for the Parcel." Additionally, Section 6.01 provides that "[t]he Developer shall notify the City in advance of any financing, secured by mortgage or similar lien instrument, it proposes to enter into with respect to such Parcel, and shall promptly notify the City of any encumbrance or lien that has been created on or attached to the Parcel, whether by voluntary act of the Developer, or otherwise, of which the Developer has notice."

It seems to us quite clear, indeed not even the City really claims to the contrary, that as between the Developer and the City the notice provision in Section 6.01 must be read as a covenant, not a condition. Thus, the Developer's agreement to provide notice to the City "of any financing secured by [a] mortgage" on the property was a promise, not a condition precedent. The Developer's failure to provide notice to the City when it obtained "financing secured by [a] mortgage" from Equitable was a breach of that promise to the City. The Developer's failure to provide this notice was not, however, a failure to perform a condition precedent relieving the City of its agreement to subordinate its rights in the property to those of the mortgagee, Equitable. Accordingly, as between the two parties to the contract—the City and the Developer—the Developer's breach of its promise to provide notice to the City did not relieve the City of its obligation to

subordinate its rights to the mortgagee, Equitable. The Developer's breach of its promise to notify did not in and of itself provide the City with a defense to avoid its obligations under the contract.

The City seems to suggest, however, that the failure to provide it notice of the financing had a very different result as to Equitable. Specifically, the City claims that because Equitable was a third party beneficiary[2] of the subordination clause in the Agreement between the Developer and the City, the lack of notice is fatal as to Equitable's claim that its lien is superior to the City's rights.

■ There is simply no support for such a claim. Rather, as Professor Corbin has explained:

If the contract between the promisee and the promisor is a bilateral contract, the promise made for the benefit of a third party may be unconditional or it may be conditional on performance of the return promise or tender thereof. *If unconditional, a breach of duty by the promisee [the Developer] will not affect the right of the beneficiary [Equitable] against the promisor [City].* If conditional and dependent, on the other hand, a failure by the promisee to perform his part may terminate the duty of performance by the promisor.

4 Arthur L. Corbin, Corbin on Contracts § 819, at 277–78 (1951 & Supp.1993) (footnotes omitted) (emphasis added). Thus, because the Developer's breach was admittedly of an "unconditional" promise, it does not "affect the right of the beneficiary [Equitable] against the promisor [the City]." *Id.* *See also,* Restatement (Second) of Contracts § 309 cmt. b (1981); *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 376, 104 S.Ct. 1844, 1851, 80 L.Ed.2d 366 (1984) (because contract did not "evidence any intent to *condition* the [third

---

**2.** As explained within, it is not all clear to us that Equitable's rights were only those of a third party beneficiary or that the third party beneficiary analysis is helpful here. In any event, as demonstrated in the text, the result is the same, whether or not a third party beneficiary analysis is employed.

party beneficiaries'] contractual right" to judicial enforcement on first seeking arbitration, arbitration was not required even though promisee had *promised* to arbitrate contract and there was a strong federal policy favoring arbitration (emphasis added)).

The above discussion, it seems to us, is illustrative of a fundamental difficulty with the parties' analysis of the issues in this case. (In fairness, we believe this difficulty contributed to our reaching what we have now concluded was an incorrect result in our December opinion.) Namely, the parties persist in characterizing Equitable as a third party beneficiary. If this is the proper mode of analysis, *i.e.,* if Equitable is truly only a third party beneficiary, we now believe it is clear that the notice provision is not a condition to Equitable's ability to assert its lien. It seems to us, however, that the discussion of third party beneficiaries may have just unnecessarily and improperly complicated this case.

The usual method of analyzing cases like the one at hand is very different. The present action was commenced by Equitable when it "initiated foreclosure proceedings" against the Developer's deed of trust. *Rockville I,* 86 Md.App. at 695, 587 A.2d 1179. The City intervened in the pending foreclosure action as a matter of right because it then owned the property. *Id.* The City asked the circuit court to declare its title to the property free and clear of Equitable's lien. This was very similar to the procedural posture in *Rockhill v. United States,* 288 Md. 237, 239, 418 A.2d 197 (1980), *i.e.,* there, too, parties asserting that they "were entitled to first lien status" intervened in the lender's foreclosure action seeking a declaration so stating. *Id.; see also Arundel Fed. Sav. & Loan Ass'n v. Lawrence,* 65 Md.App. 158, 160, 499 A.2d 1298 (1985) (vendee files in lender's foreclosure action asserting prior vendee lien); *Kennedy v. Betts,* 33 Md.App. 258, 260, 364 A.2d 74 (1976) (party to first deed of trust filed claim in foreclosure proceeding concerning second deed of trust). Moreover, the procedural posture here is the exact converse of that in *Riggs Nat'l Bank of Washington v. Wines,* 59 Md.App. 219, 222, 474 A.2d 1360 (1984), in which the party claiming the subordination

agreement had not been complied with (here the City) sued not only the party that had obtained the financing (here the Developer) but also the bank (here Equitable). *See also Hyatt v. Maryland Fed. Sav. & Loan Ass'n,* 42 Md.App. 623, 624, 402 A.2d 118 (1979). In none of these cases, however, is there any discussion of the rights of third party beneficiaries. Rather, the courts simply addressed the question of whether certain financing satisfied the subordination agreement. That, it seems to us, is the preferable mode of analysis here.

If that mode of analysis is applied, it is clear that the failure to notify the City of the Equitable financing does not constitute a failure to satisfy the requirements of the subordination agreement. In Section 6.01 of the Agreement, the City agreed that its rights would be subordinated only in two limited circumstances: (i) a loan to obtain funds "to the extent necessary for making improvements ..." and (ii) a loan to obtain "such additional funds, if any, ..." not to exceed the purchase price paid by the City. To be sure, Section 6.01 does provide that the Developer "shall notify" the City of any financing. Section 6.01, however, does not make this notice to the City a condition to the City's agreement to subordinate its rights or a requirement of an authorized mortgage. Thus, while Section 6.01 expressly provides that the Developer *"shall not engage* in any financing ... *except for"* that described in (i) and (ii), it nowhere provides that the Developer "shall not engage" in any financing "except for" that which it notifies the City of. Accordingly, the lack of notice to the City does not waive or negate the City's agreement to subordinate its interests or mean that the Equitable financing was not "authorized" under Section 6.01 of the Agreement. *Compare G. Credit Co. v. Mid–West Land Dev., Inc.,* 207 Kan. 325, 485 P.2d 205, 208 (1971) (although landlord agreed in lease "to execute necessary instruments to accomplish subordination of its fee title" because landlord's signature on those instruments "was *not* made an express *condition* to giving the lender priority" lack of landlord's signature did not render its agreement to subordinate ineffective (emphasis added)) and *Pope Heating & Air Conditioning Co. v. Garrett–Broomfield Mort-*

*gage Co.*, 29 Colo.App. 169, 480 P.2d 602, 605 (1971) (because holder of first lien did *not condition* subordination on agreement that there would be no intervening mechanic's lien, subordination was "unlimited") *with Life Savings & Loan Ass'n v. Bryant*, 125 Ill.App.3d 1012, 81 Ill.Dec. 577, 581–82, 467 N.E.2d 277, 281–82 (1984) (failure to comply with *condition precedent* of subordination agreement operates as "waiver or negation" of the subordination agreement).[3] *See also First Fed. Savings & Loan Ass'n of Warner Robins v. Delta Towers, Ltd.*, 544 So.2d 1331, 1339–40 (La.Ct.App.), *cert. denied*, 548 So.2d 1250 (La.1989).

Not only is this conclusion in accord with the black letter law on the obligations of third party beneficiaries (if that law is applicable here) and the language of Section 6.01, but it is also the only logical result. The failure to provide the City notice of the Equitable financing did not prejudice the City in any way. This breach was totally harmless and so should not be permitted to nullify the financing obligation.

This is not to say that the City has not been harmed by the Developer's various defalcations. It was, and so has been permitted to invoke appropriate remedies. For example, because the Developer breached its contract and failed to develop the property, the City was able to exercise its right of re-entry and retake possession of the property.

■ Moreover, as we held in *Rockville I*, if the City could demonstrate that the Developer secured financing with Equitable that was not permitted by the Agreement, then Equitable's lien would have no priority over the rights of the City. Section 6.01 explicitly sets forth what financing is permitted

---

**3.** *Raiford v. Department of Transportation*, 206 Ga.App. 114, 424 S.E.2d 789, 792 (1992), which is heavily relied on by the dissent, also involves, as the dissent acknowledges, a loan that violated an express "condition precedent" of a subordination agreement. In those circumstances, of course, it was appropriate to hold that the loan was not authorized under the subordination agreement. Here, as explained in text, the notice provision was not a condition, let alone an express condition, to the agreement to subordinate and so the City's failure to provide notice did not make the Equitable loan "unauthorized."

under the Agreement, *i.e.*, (i) to obtain funds "to the extent necessary for making improvements" and (ii) to obtain "such additional funds, if any" not to exceed the purchase price paid by the Developer to the City. It is quite true that Section 6.01 also provides that the Developer "shall notify the City in advance of any financing." The only purpose of the latter clause, however, is to provide the City with advance knowledge of the financing; the notice clause does not give the City the right to veto the financing or even approve it, only to be notified of it. Of course, if the financing is not permissible under the Agreement, *i.e.*, contrary to (i) or (ii) above, then the lien securing the financing would have no priority over the City's rights. On the other hand, if the financing is not contrary to (i) or (ii) then the lien securing the financing would have priority over the City's rights. In either event, the failure to provide advance notice of the financing did not in any way prejudice the City. Without the notice, the City still retains all rights to challenge the validity of the financing.[4]

For all of these reasons, assuming that the law of the case does not prevent us from reaching the question, the Developer's failure to notify the City of the financing does not mean that the financing failed to comply with the subordination clause in the Agreement.

### (iii)

Because, on reconsideration, we believe that the notice requirement provides no basis on which to reverse the circuit

---

**4.** The dissent seems to agree that the lack of notice here did not cause any "actual harm to the City." Nevertheless, it suggests that the lack of notice had the "potential" to cause harm to the City by preventing it from protecting certain of its rights, and that the Agreement "must be evaluated from the perspective of the parties at the time it was entered into." It is certainly true that a Maryland court must apply the objective law of contracts and evaluate a contract as of the time it was "entered into." In this regard it is interesting that the City has not at any time during this appeal—not in its 34 page brief, not at oral argument, and not in its memorandum in response to the motion for reconsideration—asserted that the failure to provide it notice caused it the "potential" harm suggested by the majority. If this "potential" harm really was within the City's "perspective" when it entered into the Agreement, surely it would have so asserted.

court, we must reach the other grounds for reversal urged by the City.

After we remanded this case to the circuit court "for an evidentiary hearing to determine whether appellee complied with the provisions of Article VI when it loaned the Developer the $900,000," *Rockville I,* 86 Md.App. at 703, 587 A.2d 1179, the lower court conducted a two and a half day trial in which it considered the testimony of ten witnesses and more than fifty exhibits. Among the trial witnesses were Equitable's president and in-house counsel, the City Attorney, and several experts for both sides.

Much of the testimony at trial involved the theory, then espoused by the City, that in order to satisfy the requirements of Section 6.01 (to obtain funds "to the extent necessary for making improvements") a loan must be for hard costs (to "build bricks and mortar and for constructing improvements"), not soft costs (architectural, engineering, permit, legal, advertising, and other costs necessary for making improvements but not actual construction costs). After all of Equitable witnesses, and most of the City's own experts, testified that soft costs are "necessary for making improvements on property," the circuit court expressly rejected this argument:

It is clear to the Court that *the words "necessary for making improvements" includes soft costs as well as hard costs.* That argument has been made by the City and its attorneys on multiple occasions before, and I simply don't accept it.

*The evidence here is overwhelming.* There is nobody who really disagrees including the City's experts in this case that a loan necessary for making improvements includes soft costs by which I mean architectural, engineering, legal, advertising, and so on and so forth costs that are part and parcel of any development project.

(emphasis added).

In *Rockville I,* we noted that the purpose of a subordination clause is to assure that the "primary interest (here, the City's interest) in a property would not be adversely affected by

subordination to a construction loan." *Rockville I,* 86 Md.App. at 702, 587 A.2d 1179. While the subordination clause would not protect the City from the possibility that the Developer would unlawfully divert funds in violation of conditions attached to the loan, the clause would protect the City from Equitable's approval of the use of construction loan money for a purpose "other than that contemplated by the subordination clause—such as improvements to some property other than that named in the deed of trust." *Id.* at 703, 587 A.2d 1179. The circuit court also expressly found "that the purpose of [the Equitable] loan was to reimburse the Developer for acquisition costs and soft loan costs," which "was characteristic of banking in the mid–80s" and "wasn't illegal." Thus, the lower court rejected any suggestion that the Equitable funds were used to make "improvements to some other property" or for some other purpose not "contemplated by the subordination clause." *Rockville I,* 86 Md.App. at 703, 587 A.2d 1179.[5]

The City does not pursue the hard cost—soft cost argument on appeal. Instead, the City's principal focus on appeal is that the Equitable loan was not authorized under Section 6.01 because it did not comply with form contract language developed by the United States Department of Housing and Urban Development (HUD). Specifically, the City asserts that, contrary to certain HUD form requirements contained in the Agreement, the loan was a "land loan with no required purpose or disbursement mechanism," that "did not provide the full amount of financing necessary to complete the required improvements," was for a term of "less than five years," and did not provide for the right of the city to cure a default. Further, the City claims Equitable's attorney knew of these requirements but made "no effort to comply" with them. The foundation of all of these arguments is thus the HUD form requirements for urban renewal projects, which

---

5. By so finding the circuit court also rejected the City's argument that the Equitable loan was "unauthorized" because it did not require that funds be spent for a proper purpose or contain a required "disbursement mechanism."

were incorporated into the agreement between the City and the Developer. At trial, the City's witnesses testified as to their previous experience with this HUD form language and what was required by it. On appeal, the City, of course, emphasizes this testimony in claiming the lower court erred in finding that the loan, which admittedly did not comply with these provisions, was not authorized by Section 6.01.

What the City attempts to ignore is the fact that there was abundant evidence—including the testimony of its own witnesses—that the agreement the City reached with the Developer here was in critical respects unlike any other urban renewal agreement ever entered into by the City. For example, virtually all witnesses agreed that normal HUD procedures (and HUD form provisions in the Agreement) required, as a condition precedent to conveying title to a developer, that the developer submit redevelopment and financing plans and an approved construction loan but that *none* of these requirements were complied with before the City's conveyance to the Developer here. For this reason and others, the circuit court made express findings rejecting the City's claim that the failure of the Equitable loan to comply with other HUD form contractual provisions meant that it was not a loan authorized under the subordination clause in Section 6.01. The lower court concluded that the Equitable loan was a short term, bridge loan, which did not have to comply with these contractual requirements, but which was still authorized by Section 6.01.

Thus, the circuit court expressly found:

Now, this was an urban renewal type agreement. It was based on the standard urban renewal type agreements, but what is clear is that it had some significant variations. One of its most significant variations was that the City in this case transferred title before it had—before it required any proof of long-term financing in connection with this case; that is, for the construction and development of this project.

It did so because it felt that it had a strong remedy in the event of default, but the fact is it did so and in that respect

varied considerably from the standard urban renewal contracts that were in place prior in Montgomery County or really anywhere in the country.

It is clear, too, that the City was under great pressure, highly desirous of getting something done on this project quickly because of the terrible situation and the contentious property[,] the Rockville Mall. Because of the prior default of another developer, they were desperate to get this thing going, and they really wanted it bad.

As one eminent lawyer once told me, when you want it bad, you get it bad, and in my view that is what happens to the City of Rockville in this case. They got it bad. They drew an agreement with sufficient loop holes in this case that in my view I can only conclude that despite the fact that Equitable acted, I think in terms of it underwriting somewhat carelessly, there is a prior lien that is valid against the City's right of reentry. . . .

. . . .

The question is—I say all this because you have got an urban renewal contract which really varies from the norm, that is not all that common in the City of Rockville—I mean, all urban renewal contracts in the history of the City are in evidence in this case, and the question is what would reasonable people under these circumstances understand this agreement to mean.

They didn't have the standard contract in front of them. They didn't know the extent to which necessarily this might vary from it. The question is in the context of this whole agreement and this rather urgent desire to go quickly forward with the contract and even change the standard provision to allow for passage of title before confirmation of financing what the parties under the agreement could do.

. . . .

As I read 2.01 of the agreement, . . . it refers to "a firm and binding commitment . . . to complete the required improvements."

... [U]nder the prior provision, 1.01(j), firm and binding commitment for financing means a legally binding letter of commitment from a financial institution for the full amount of construction and interim financing for a period of less than 5 years which includes ... and so forth.

Now, I read that to be one kind of loan. I read that not necessarily to cover the bridge loan. Now, it certainly covers the construction loan and it certainly covers the permanent loan and maybe the mini-permanent loan, but it doesn't clearly cover in my view the bridge loan.

. . . .

A bridge loan that could do this would be acceptable. Now, I don't see anything either in 6.01 that limits the reimbursement, that limits the payments of the acquisition costs to a purchase money payment. It just doesn't say that.

It says that funds are permitted to the extent of up to the purchase price, additional funds of the amount paid by the developer to the City. All the experts indicated that it was common for borrowers to reimburse themselves by financing after the fact having purchased first for cash.

■ We note that the circuit court did not make express findings with regard to three of the City's arguments, *i.e.,* the loan was unauthorized because (1) Equitable's attorney was aware of but made no effort to comply with the requirements of the Agreement, (2) the loan was for an unauthorized purpose and without a required "disbursement mechanism" and (3) the loan contained no provision authorizing the City to cure a default by the Developer. These omissions are of no consequence because the lower court implicitly rejected all three arguments. Moreover, as to the first, we explained in our December opinion, "whether Equitable was aware of the terms of the Agreement is irrelevant to determining whether" its loan was authorized. *Rockville II,* 98 Md.App. at 409, 633 A.2d 479. With regard to the second argument, the circuit court, as noted within, *see* note 3 and accompanying text, expressly found that the Equitable loan was for an authorized

purpose—to reimburse the Developer and pay soft costs—and so impliedly found the lack of a disbursement mechanism—typical in only true construction loans—unnecessary. Finally, as to the third, concerning the lack of an opportunity to cure provision, the City's brief argument on this point is simply that the purpose of such a clause is "to assure the completion of improvements" if the financing for that purpose is insufficient. The circuit court's numerous and explicit findings that the purpose of the Equitable loan was not to supply financing for completion of improvements but only to be a "bridge loan" to reimburse the Developer for his purchase price and to pay soft costs, is also an implicit rejection of the theory that the lack of a cure provision makes the Equitable loan unauthorized.

 It is hornbook law, memorialized in Md.Rule 8–131(c), that "[w]hen an action has been tried without a jury, the appellate court ... will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of witnesses." This means that if, considering "the evidence produced at trial in a light most favorable to the prevailing party ...," there is evidence to support the trial court's determination, it will not be disturbed on appeal. *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 41, 382 A.2d 564 (1978). Moreover, "[i]f there is any competent, material evidence to support the factual findings below, we cannot hold those findings to be clearly erroneous." *Staley v. Staley*, 25 Md.App. 99, 110, 335 A.2d 114, *cert. denied*, 275 Md. 755 (1975). The City never even directly claims that the circuit court findings are clearly erroneous. They are not; there is abundant evidence in the record supporting them including the testimony of the City's own witnesses.

In sum, there is no basis for reversal of the circuit court judgment. Accordingly, we grant the motion for reconsideration and affirm the judgment of the Circuit Court for Montgomery County.

MOTION FOR RECONSIDERATION GRANTED.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

Dissenting Opinion by WENNER, J.

WENNER, Judge, dissenting.

I respectfully dissent, because I disagree with the majority's approach to this case.

Although the Agreement contains the rights that would allow Equitable's mortgage to survive the City's reentry, those rights are granted only to holders of "authorized mortgages." Unfortunately, the Agreement does not define this term. Consequently, in my view, the question to be resolved is "what comprises an authorized mortgage?" In other words, is a mortgage an authorized mortgage only when it satisfies all of the Agreement's provisions regarding financing on the property, including the loan purpose and loan limit restrictions, notice, and inclusion in the loan documents of certain rights to accrue to the City if the Developer defaults on the mortgage? Are the requirements of an authorized mortgage the loan amount and loan purpose restrictions and notice specified in Section 6.01 of the Agreement? Or is a mortgage an authorized mortgage simply by complying with the loan amount and loan purpose restrictions?

To some extent, the arguments presented in this case have become tangled in semantics. Equitable objected to our December opinion's characterization of the requirements of Section 6.01 as "conditions" of authorization, and argues that these requirements are promises, not conditions. According to Equitable, the Developer's failure to comply with these requirements should not deprive Equitable of rights under the Agreement.

I agree with the majority that, between the Developer and the City, Section 6.01's notice requirement is a promise. In fact, between the Developer and the City, *every* requirement in Section 6.01 is a promise. The Developer promised not to place financing secured by a mortgage on the property ex-

ceeding certain loan amounts, and to give the City advance notice of any financing secured by a mortgage that it placed on the property. Where I disagree with the majority, however, is in its view that, because the notice requirement is not a condition to one party's performance under the Agreement, it cannot be a condition to a third party obtaining rights under the Agreement.[6]

The Court of Appeals discussed subordination clauses in *Rockhill v. United States*, 288 Md. 237, 418 A.2d 197 (1980):

The term "subordination" is used in at least two general senses in the cases of the type presented here. One aspect refers to the executory promise to subordinate to financing of a described type (herein sometimes called a "subordination clause"). The term is also applied to the declaration or agreement which expressly manifests assent to the priority of a specific lien (hereinafter sometimes called a "subordina-

---

6. Although it is not necessary in many cases involving subordination agreements to delve into a third party beneficiary analysis, that does not mean that one who gains priority under such an Agreement is not a third party beneficiary. To be sure, Equitable is not a party to the Agreement between the Developer and the City, yet the rights Equitable asserts are derived from the Agreement. Except for the Agreement, Equitable would have no claim to priority, as the City's deed to the Developer, containing the City's right to reenter, was placed of record prior to Equitable's mortgage. The provision for a nonparty's assertion of rights under a contract is the classic third party beneficiary situation. *See Flaherty v. Weinberg*, 303 Md. 116, 125, 492 A.2d 618 (1985) ( [A] third party beneficiary contract arises when two parties enter into an agreement with the intent of conferring a direct benefit on a third party, permitting the third party to sue on the contract despite the lack of privity.).

The third party to be benefited need not be known at the inception of the contract; nevertheless, the beneficiary must be ascertainable and identified before gaining any enforceable rights under the contract. *Shillman v. Hobstetter*, 249 Md. 678, 687–88, 241 A.2d 570 (1968) (quoting *Marlboro Shirt Co. v. American District Telegraph Co.*, 196 Md. 565, 569, 77 A.2d 776 (1951)); *Parlette v. Parlette*, 88 Md.App. 628, 637, 596 A.2d 665 (1991); *see also* 17A Am.Jur.2d, *Contracts* § 454 (1991); 17A C.J.S., *Contracts* § 519(4)(d) (1963). Although, between the City and the Developer, the requirements of Section 6.01 are covenants, those same requirements establish the basis for ascertaining which mortgage holders gain rights under the Agreement. They are thus prerequisites or conditions to third party beneficiary status.

tion agreement"). Some subordination clauses contemplate the execution by the subordinator of a subordination agreement. Others are drafted with the object of effecting subordination without further documentation when a given loan falls within the description of the subordination clause ("automatic subordination").

*Id.* 288 Md. at 241, 418 A.2d 197. In short, the Agreement in the case *sub judice* contains an "automatic subordination" clause. The execution of a separate agreement of subordination was not contemplated; subordination would occur and the statutory order of priority would be altered when a loan secured by an authorized mortgage was made. In other words, the City's agreement is not "to subordinate" in the future, but that its right of reentry "is subordinate" to an authorized mortgage. The task of the court, then, is to determine whether an authorized mortgage exists. If the mortgage is authorized, the holder of the mortgage is a third party beneficiary under the Agreement and may assert the rights, including the right of priority, granted to holders of an authorized mortgage. On the other hand, if the mortgage is not authorized, the holder of the mortgage is not a third party beneficiary, and has no rights under the Agreement. I agree that if notice is not a requirement of authorization, then the Developer's failure to give notice to the City is not a defense available to the City to defeat an authorized mortgage holder's rights under the Agreement. If, however, notice is a requirement of authorization, then the Developer's failure to give notice precludes Equitable from asserting any rights under the Agreement.

It is undisputed that the loan purpose and loan amount restrictions are conditions of authorization. The notice requirement is in the same section of the Agreement as, and immediately follows, the loan purpose and loan amount restrictions, and the same terminology is used to establish each of these requirements. The first right granted to a holder of an authorized mortgage, to receive notice of a default by the Developer, presumes that the City has been notified of the existence of the mortgage and has been provided an address

for the mortgagee. Although the majority says that "it is clear that the failure to notify the City of the Equitable financing does not constitute a failure to satisfy the requirements of the subordination agreement," nowhere does the majority explain how it reached its determination that the requirements of authorization are limited to Section 6.01's loan purpose and loan amount requirements.

The majority seems to base its determination that notice is not a condition of authorization on its view that "the only purpose of the notice clause is to provide the City with advance knowledge of the financing" because the notice clause does not give the City the right to veto or approve the financing, and that the Developer's failure to provide notice was harmless and did not prejudice the City. I do not believe that the absence of actual harm to the City from the lack of notice prevents notice from being a condition of authorization.

In the first place, the Developer's failure to give the City advance notice of Equitable's loan prevented the City from protecting its right under the agreement to have clauses included in the mortgage granting it rights in the event of the Developer's default on the loan, and to place on record a request that Equitable give it notice of any foreclosure proceedings it might institute.[7] These omissions could have been significant had the Developer defaulted in its obligations to Equitable before defaulting under the Agreement. The Agreement must be evaluated from the perspective of the parties at the time it was entered into; the court cannot second guess the meaning of a contractual term based on whether a potential harm actually developed. *See Jenkins v. Karlton,* 329 Md. 510, 525, 620 A.2d 894 (1993) (under the objective law of contracts, Maryland courts seek to determine, from the language of the contract, what a reasonable person in the position of the parties would have meant).

---

7. *See* Maryland Code (1974, 1988 Repl.Vol., 1993 Cum.Supp.), § 7–105(c) of the Real Property Article.

In the second place, even if it were obvious at the time the contract was entered into that advance notice of financing secured by the property would be of little or no benefit to the City, that would not nullify a provision of the Agreement making notice a requirement of authorization. *Raiford v. Department of Transportation,* 206 Ga.App. 114, 424 S.E.2d 789, 791–92 (1992), is illustrative. The subordination of a lessee's leasehold interest to future mortgages encumbering the property was expressly conditioned on the mortgages containing a covenant of quiet possession in the favor of the lessee. Mortgages not containing the required provision were later placed against the property. After Georgia's Department of Transportation condemned the property, the trial court was asked to determine who was entitled to the proceeds. The parties agreed that, when the subordination provision was drafted, the lessor and lessee were contemplating priorities in the event of foreclosure. According to the lenders, the failure to include the covenant of quiet possession was immaterial, because it would have duplicated the lessee's legal right to remain in possession in the event of foreclosure. Thus, the failure to include the covenant of quiet possession could not have resulted in harm to the lessee. The Georgia court summarily dismissed this argument as "confus[ing] contractual rights with statutory rights." The failure of the mortgage to contain a covenant of quiet possession meant that the lenders did "not have a contractual right to priority under the lease's subordination clause." *Id.* at 792.

I am still not convinced that notice is not a condition of authorization. Consequently, for the reasons set forth in our December opinion, I would reverse the judgment of the circuit court.