691 A.2d 283

**Mary Frances RICKER**

v.

**Mark Steven RICKER.**

**No. 1048, Sept.Term, 1996.**

Court of Special Appeals of Maryland.

March 28, 1997.

584

Charles Michael Tobin (Ober, Kaler, Grimes & Shriver, on the brief), Washington, DC, for Appellant.

Mark A. Pudinski, Chester, for Appellee.

Argued before EYLER, THIEME and SONNER, JJ.

SONNER, Judge.

Appellant Mary Frances Ricker has taken this appeal from the denial by the Circuit Court for Queen Anne's County of her domestic violence petition against her husband, Mark Stephen Ricker, appellee. She has presented three issues, which we have restated somewhat:

1. Did the circuit court abuse its discretion in refusing to issue an order of domestic violence protection?

2. Did the court violate appellant's right to a fair hearing by threatening her with a finding that she was unfit to have custody of her minor child if she continued with the presentation of her case?

3. Did the court err in refusing to allow appellant to introduce evidence of appellee's alcohol abuse?

Mr. and Mrs. Ricker were married on February 19, 1993. On February 28, 1995, Mrs. Ricker gave birth to a child, Mark Stephen Ricker (Baby Mark). In December 1995, while the Rickers were visiting Mrs. Ricker's parents in Wallingford, Pennsylvania, the couple had an argument, apparently about when they would return to their home in Centreville, Maryland. Mr. Ricker left abruptly without taking Mrs. Ricker or Baby Mark with him. The Rickers have not lived together since then.

On February 12, 1996, Mrs. Ricker filed a Petition for Protection from Domestic Violence in the Circuit Court for Queen Anne's County. The next day, the court, pursuant to a second amended petition from Mrs. Ricker, issued an *ex parte* Order for Protection from Abuse, and scheduled a hearing for February 20, 1996. In her petition, Mrs. Ricker alleged a course of abusive and violent conduct by her husband extend-

ing from January 1994 until the date in December when he left her in Wallingford, Pennsylvania. She also alleged "that the endangering conduct of [Mr. Ricker] has not been limited to threats to [Mrs. Ricker] but recently had extended to the parties' son."

Mrs. Ricker's complaint requested relief from alleged abuse pursuant to Md.Code, Family Law Article (hereinafter FL), Sec. 4–504. The procedure established by the General Assembly in the spousal abuse statute is for the spouse seeking protection to file a petition with the court under oath setting out the nature and extent of the abuse. If the court thereafter finds reasonable grounds to believe that the petitioner has been abused, the court, in an *ex parte* hearing, may issue a temporary *ex parte* order granting relief. The temporary order can last no more than seven days after service of the order unless continued for good cause. The respondent is entitled to a hearing at which the petitioner must carry the burden of showing by clear and convincing evidence that the abuse has occurred. If the court finds that the petitioner has met the burden, it may issue a protective order tailored to fit particular needs that the petitioner has demonstrated are necessary to provide relief from abuse. The applicable section of the Maryland Code provides:

The protective order shall order the alleged abuser to refrain from abusing household members and may:

(1) except in a case of alleged child abuse or alleged abuse of a vulnerable adult, order the alleged abuser to vacate the family home immediately and grant temporary possession of the family home to the petitioner for not more than 30 days;

(2) in a case of alleged child abuse or alleged abuse of a vulnerable adult, order the alleged abuser to vacate the family home immediately and grant temporary possession of the family home to an adult household member for not more than 30 days;

(3) award temporary custody of a minor household member;

(4) direct any or all of the household members to partici-pate in a professionally supervised counseling program; and

(5) order any other relief as necessary.

FL Sec. 4–506(e).

The court, after the February 20th hearing, denied the petition. Mrs. Ricker contends that the court's denial was in error because she had met her burden and, therefore, the circuit court should have issued a protective order. As we pointed out above, the burden is on the petitioner to show by clear and convincing evidence that the alleged abuse has occurred. FL Sec. 4–506(d)(2). This Court will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the trial judge's assess-ment of the credibility of witnesses. Maryland Rule 8–131(c). *See Mayor of Rockville v. Walker,* 100 Md.App. 240, 640 A.2d 751 (1994).

Here, the evidence Mrs. Ricker presented consisted of her testimony that Mr. Ricker struck her and shoved her into a door at their home on December 16, 1995. She testified that on February 6, 1996 Mr. Ricker cornered her and refused to let her pass through a doorway at the University of Maryland, where she was attending a class. She also testified that Mr. Ricker "frequently" struck her infant son in the face, and she related an incident in which appellee sprayed her in the face with bathroom cleaner and "shoved her." She testified that Mr. Ricker frequently became intoxicated and that his behav-ior was "affected by alcohol consumption."

Her next door neighbor testified that she had seen Mr. Ricker strike Baby Mark in his face "very, very hard—more than I thought necessary—which made him cry and [Mrs. Ricker] came and took him away." Mrs. Ricker's mother testified that she had seen appellee strike Baby Mark on his face to the point that she expressed concern that the baby would suffer "brain damage." The last witness, Mrs. Ricker's sister, testified that when Baby Mark was twelve days old, she attended his christening and on that weekend observed that

there were "numerous occasions" that Mr. Ricker would slap Baby Mark's face until it was red and take the baby and shake him. Certainly, Mrs. Ricker, through the witnesses' testimony as well as her own, presented a *prima facie* case which, if believed, would have supported the court in issuing a protective order.

Mr. Ricker, in his case, denied that the incidents had occurred or stated that they were "grossly mischaracterized" by Mrs. Ricker and her witnesses. Mr. Ricker offered his brother and two witnesses, who were acquaintances of both parties. They all testified in support of his position that the incidents Mrs. Ricker alleged never occurred. During argument to the court at the close of all the evidence, the attorney for Mrs. Ricker had the following exchange with the court:

MR. TOBIN: The psychology of this offense, Your Honor, is such that it's known over and over again that women in this situation act in a way which under other circumstances might appear to be inadequate to protect themselves, yet they're seeking all the time to protect themselves. I recognize that the Court finds that Mrs. Ricker has behaved in that way, but that is simply the standard way in which the experts—

THE COURT: Counsel, then it's a no win situation, isn't it?

MR. TOBIN: Yes, it is.

THE COURT: The situation is always that if the wife reacts, then she's reacting improperly, and if she doesn't react, she's evidencing that she's been abused. So how is a trier of fact—what is it that she can do? Must I just regard her testimony as neutral?

MR. TOBIN: No, because—

THE COURT: Because it means one or the other thing. Go ahead.

MR. TOBIN: I think Your Honor has the opportunity not only to hear her testimony but has the opportunity to hear the testimony of unrelated people who have come into this court and said what they observed that was in public. And the Court is then left with the testimony of the two parties,

a husband who says there never was any contact of any kind, the wife has made the entire matter up, that it's a complete lie. Your Honor, I respectfully—

THE COURT: Counsel, why is it that the written record is totally silent until today with regard to any physical abuse to the child? Absolutely silent. All the papers that she's filed, including this one—

MR. TOBIN: I think—

THE COURT: I read it and read it and I read for it [sic] in vain. It's not even hidden in any of these papers, sir.

MR. TOBIN: I think, Your Honor, if I may—

THE COURT: Yes.

MR. TOBIN: I think it is mentioned in the papers that she's concerned about the well being of her child.

THE COURT: Counsel, then how do you come in here today with all this squeezing of the cheeks and everything that's supposed to be child abuse? If it was that, you certainly would have run that banner up first, and you and I both know it, and the only thing that's said here in the papers in the other cases that were filed, as recently as the 12th of this month, the same time you did this, the only thing said about the child is something about the child being harmed by his conduct toward her, about which, incidentally, I heard nothing today. So the entire focus on the child is entirely—the whole scenario with regard to the child is different today than what is reflected in the papers you've filed.

MR. TOBIN: That doesn't make it any less so, Your Honor.

THE COURT: Counsel, I want you to know, when you're sitting as a trier of fact and when the standard is clear and convincing, it comes close to it. Go ahead.

MR. TOBIN: Thank you, Your Honor.

THE COURT: Anything else?

MR. TOBIN: No, sir.

Mrs. Ricker asserts that the court, by its statements in this exchange, ignores the nature of spousal abuse. She argues

that the circuit court should have excused her from having to assemble evidence of Baby Mark's abuse before the initiation of custody proceedings because the nature of the "Battered Spouse Syndrome" explains her failure to take any public action.

That the spousal abuse syndrome can explain a failure to make a public complaint is a fact that we accept, but, first, the trier of fact must find some believable other evidence that the allegations of abuse did occur, which would mean that he would have had to give some credence to Mrs. Ricker's testimony. The trial judge apparently did not believe that it was entirely credible, as can be seen when we examine an exchange between the court and counsel for Mrs. Ricker.

After the court's ruling, Mr. Ricker's attorney pointed out that, since the judge had denied the petition, visitation was not provided for. He informed the court of the pending domestic case in which he had petitioned for an emergency *pendente lite* hearing and attempted to have the court consider that petition as well. That is when the following transpired:

MR. TOBIN: We would object to an unsupervised visit without an opportunity to put on our case.

THE COURT: Why?

MR. TOBIN: Because my client feels the child is in danger, for the reasons presented.

THE COURT: Your client then should have mentioned that in the cases here, prepared by you and signed by her, in which she doesn't even hint at it, Counsel, and, Counsel, I'm telling you, she's going to have to do a mighty lot of convincing to bring that up now. She's just a little late in thinking that one up.

MR. TOBIN: I would respectfully suggest she didn't think it up. It's part of the entire malady.

THE COURT: As I said, you can't—I don't mean you—one can't lose with that one, you see, but there are always, as the standard instructions to the jury indicate, we can't look into someone's mind, but there are little indicators we can see, and as one of the witnesses testified, there are little

things you can see and sense about a situation and a relationship. And there are also things that one can see, when she's now in a place of safety, where she's totally bared her soul, where her venom is obvious, and she says absolutely nothing in any of these papers about the child being harmed—nothing. And now for the first time at four o'clock on the 20th of February, that whole thing surfaces and I'm to believe it? That would strain the credulity of the most credulous. I'm sorry.

MR. TOBIN: Well, Your Honor—

THE COURT: And there's been nothing shown to me today that I think this man represents the slightest harm to his child.

MR. TOBIN: May I proffer to the Court, a great deal of what's been presented to the Court today has been presented as a result of my investigation and talking with witnesses other than Mrs. Ricker, and dealing with her on recognizing what in fact was going on and I think that's a characteristic of household domestic abuse.

THE COURT: Counsel, I've read the books, too. I know that's what they say, and, as I say, it's a Catch–22 situation for the person accused of it, because it's said that if there is abuse or the person does something, well, that was because they were abused. If the person says nothing, that's a sign that they were abused. This is a better form. Its worst form is the situation of the poor children who are supposed to have been sexually abused and all that silence portends. But I'm sorry sir, I just cannot see that in her situation. I could go for the whole bit of being in fear but she's not been in any fear at least since December 31st, she's been out of it, and she's been going at it tooth and nail ever since then, keeping her child from his father, and on very specious grounds, because you're the one that dug this up. She didn't even know about it. Very specious grounds, You're the one. She didn't even know it—

MR. TOBIN: I—

THE COURT:—which makes her conduct, by definition, groundless....

■ The trial judge, in this exchange, makes clear that he considered Mrs. Ricker's testimony, indeed her entire case, to be suspect.

Certainly, Mrs. Ricker can argue to the court that such a phenomenon occurs and that it is widespread. She, however, would have the law go further and require that the court must infer spousal abuse and child abuse from her silence. The General Assembly acknowledged the "Battered Spouse" phenomenon by enacting the Courts and Judicial Proceedings Article of the Maryland Code, Sec. 10–916, which allows criminal defendants to introduce evidence that he or she has been battered, and to put on expert testimony as to the effects of "Battered Spouse Syndrome." But such recognition by the Assembly does not require that the court, under all circumstances, accept "Battered Spouse Syndrome" as an explanation for a spouse's failure to complain. Before the court was evidence from Mrs. Ricker and her witnesses, two of whom are related to her, that she was, indeed, suffering from abuse. The court would, of course, have to believe some of the testimony that she was a battered spouse before he could assign the Battered Spouse Syndrome as an explanation for the lack of supporting evidence in the form of an earlier complaint. He would have to find the evidence credible.

The determination of credibility is a matter left entirely to the trial judge who has the opportunity to gauge and observe the witnesses' behavior and testimony during the trial. Maryland Rule 8–131(c). *See Mayor of Rockville v. Walker,* 100 Md.App. 240, 640 A.2d 751 (1994). The trial judge in this case apparently did not believe that Mrs. Ricker supplied sufficient evidence to indicate that she was a battered spouse. Therefore, he did not have to infer from the evidence that Mrs. Ricker was intimidated into remaining silent about Mr. Ricker's abuse of their infant child. Accordingly, we find that the circuit court did not abuse its discretion in refusing to issue an order for domestic violence protection.

■ In the second issue, Mrs. Ricker's specific allegation of error is that, during the presentation of her evidence at the hearing, the judge threatened her with a finding that she is unfit to have custody of Baby Mark. She alleges that she felt compelled, as a consequence, to restrict her presentation of evidence rather than risk losing her infant child. After a review of the record, we do not find error here either.

At the February 20th protective order hearing, Mrs. Ricker testified first and then called three other witnesses, a next door neighbor, her mother, and her sister. During her sister's testimony, the following occurred:

[MR. TOBIN:] I want to direct your attention to the time when young Mark came home from the hospital, the baby, Mark. Was there an event which caught your attention?

THE COURT: Counsel, you know, I want to tell you, I heard your client say that she did nothing for a very long time, and you should know that you're building a very strong case, if she was unable to take care of her child for the protracted period of time that you're telling me, I have great fears about her having the child in the future. Now, I think you're indulging, sir, in a bit of overkill.

MR. TOBIN: Your Honor—

THE COURT: He was good enough for her to live with for a rather extended period of time. You sat on this, sir, by your own statement, this which is supposed to be an emergency situation for domestic violence, this, you say, was signed many days before it ever got filed—

MR. TOBIN: I don't think Your Honor is acquainted with the circumstances behind that. We have not gone into that, but the fact of the matter is, Your Honor, my client was protected during that time by an order from a court in Pennsylvania, as the Court well knows. I am not trying to indulge in overkill, Your Honor, I'm trying to see to it that my client gets the hearing that she needs and the protection that she needs. If the Court has heard enough, I'm prepared to stop at any time.

THE COURT: You may proceed, Counsel.

MR. TOBIN: Thank you, Your Honor.

THE COURT: But, as I said, it will do your case no good to engage in overkill. What is overkill, I leave to you. Go ahead.

 Judges, under the law, have wide latitude in the conduct of trials and may, when necessary, interrupt and restrict attorneys in the presentation of their cases in an attempt to assure a correct presentation. *Gerstein v. State,* 10 Md.App. 322, 270 A.2d 331 (1970), *cert. denied,* 402 U.S. 1009, 91 S.Ct. 2191, 29 L.Ed.2d 431 (1971). It is desirable that judges participate directly in trials: "[T]he trial judge bears the responsibility for the orderly and fair administration of a trial and is not to be merely regarded as a referee." *In re J.A. & L.A.,* 601 A.2d 69, 76 (D.C.App.1991). Particularly in non-jury cases, a trial judge is accorded substantial leeway in participating in the trial because the judge functions as a trier of fact as well. *Id.*

It is often helpful to a litigant in a non-jury case to discover the direction that the judge is leaning, or to assess the judge's evaluation of the evidence as it is unfolding. Judges frequently do what juries cannot do during trials and engage in colloquies with attorneys. Those colloquies can contribute to a sharpening of the attorneys' presentations and arguments. Participation by the court in the questioning of witnesses or in commenting on the evidence can promote an orderly and efficient use of court resources.

 Active involvement by a judge, however, must be done prudently. Even the most unbiased judge, by actively engaging in the trial, runs the risk of appearing to lack objectivity and may chill the attorney's capacity to represent the client's interest most effectively. A judge who makes comments that devalue a litigant's presentation midstream may not be forwarding the goals of a fair trial, but instead may lead the restricted party to believe that the judge is unwilling to listen. A judge who creates a courtroom atmosphere that appears unfair to the litigants may unintentionally cause the proceeding to become unfair. The litigants may react by abandoning

a planned strategy or line of questioning that could affect the result or the record. A judge's participation should not overreach and disrupt a litigant's development of the evidence. Such behavior can transcend the bounds of proper judicial conduct and can go so far as to deprive a litigant of the right to a fair trial. *Western Maryland Dairy Corporation, et al. v. Brown*, 169 Md. 257, 266, 181 A. 468 (1935).

In the case before us, just what the trial judge meant by injecting himself in the proceedings and using the word "overkill" is not clear. On its face, his use of that word followed by, "you are building a very strong case," could have led the participants to conclude that Mrs. Ricker had already convinced him of the truth of the allegations and that she need not present any more testimony. That, however, is completely at odds with his eventual ruling and subsequent remarks. A different reading of the colloquy leads to the inference that the court was connecting Mrs. Ricker's coming divorce litigation in his court, in which custody or visitation was certain to be an issue, with the determination of whether or not to issue a protective order. One could go further and infer that he was threatening to take Baby Mark from Mrs. Ricker if she continued with evidence of Baby Mark's mistreatment while in her custody. That is what Mrs. Ricker and her attorney say they inferred, and it is certainly understandable that consequently they perceived that they were not getting a fair hearing. The unfair appearance to them may have been heightened by the trial judge's remarks when he later interrupted Mrs. Ricker's counsel during closing argument:

> MR. TOBIN: ... There has been physical contact. It's true there are a number of witnesses who have testified that they did not see physical physical [sic] contact, but, of course, they were not present at all times, but a number of witnesses have testified that indeed they did see physical contact. Spousal abuse is a dirty hidden matter that is simply not on the public record. It's secret. It's very difficult to prove.

THE COURT: Counsel, is it a secret that a mother, for over a year, is going to see and hear about things that happened to her child and does nothing about them?

MR. TOBIN: I think she did, Your Honor. She did what she could do.

THE COURT: What did she do?

MR. TOBIN: She took the child and went into a room with the child. She protected her child.

THE COURT: All right, go ahead.

These remarks by the trial judge, combined with his earlier remarks, can be read as a veiled reference to some later ruling regarding custody or visitation issues between the parties. Nothing in the record remotely suggests that Mrs. Ricker's behavior was such that would justify the court in removing Baby Mark from his mother's care. Mrs. Ricker, however, strongly suggests that she was in fear of the threat and states in her appeal that she restricted her presentation of evidence as a consequence. This fear may not have been justified, but it was reasonable for her to have had it.

Proper judicial conduct demands that judges refrain from activity that unnecessarily restricts litigants' ability to present their cases and to develop their evidence. Maryland Rule 16–813 governs the conduct of judges:

(5) A judge should accord to every person who is legally interested in proceedings, or the person's lawyer, full right to be heard according to law. . . .

\* \* \* \* \* \*

(9) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not permit staff, court officials and others subject to the judge's direction and control to do so.

Maryland Rule 16–813, Canon 3(A) "Impartial and Diligent Performance of Judicial Duties." Nothing is so valued in a judge as judicial temperament that forwards the appearance as well as the actuality of objectivity and impartiality. A judge certainly ought not to conduct a hearing in such a manner that permits litigants to feel threatened or to discourage them from presenting their cases completely. The issue for this Court to decide, on the record before us, is whether the remarks by the trial judge deprived Mrs. Ricker of a fair trial. The issue is beyond whether the observation and comments were proper. Assuming that they were improper and injudicious, it falls upon us to then determine whether those remarks were such that their effect upon the hearing deprived Mrs. Ricker of due process.

Judicial remarks can be so troublesome, under some circumstances, as to invite reversal, even in a non-jury trial. In *Sacher v. United States*, Justice Frankfurter, in his dissent, foreshadowed his later majority opinion on judicial overreaching:

> Law itself is on trial as the "stern daughter of the voice of God." Throughout the proceedings, even after the trial judge had indicated that he thought defense counsel were in conspiracy against him and were seeking thereby to subvert the trial, he failed to exercise the moral authority of a court possessed of a great tradition. He indulged them, sometimes resignedly, sometimes playfully, in lengthy speeches. These incontinent wrangles between court and counsel were punctuated by occasional minatory intimations from the Bench. As in the case of parental warnings to children, feckless repetition deprived them of authority.

*Sacher v. United States*, 343 U.S. 1, 38, 72 S.Ct. 451, 469, 96 L.Ed. 717 (1952). Two years later, in *Offutt v. United States*, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954), the Supreme Court confronted a situation in which a trial judge allowed an obvious personal clash with the petitioner to infect the proceedings. The Court, through Justice Frankfurter, reversed the trial court's ruling, stating that a judge must impose his "moral authority" on the proceedings so as not to preclude the

atmosphere of austerity. Moral authority is "indispensable for an appropriate sense of responsibility on the part of court." *Id.* at 17, 75 S.Ct. at 15.

Other courts have expressed the same expectations for the behavior of trial judges. In *In re Shana M.*, 26 Conn.App. 414, 600 A.2d 1385, 1386 (1992), the court held that "[t]he trial judge must be ever vigilant to consider his conduct from the viewpoint not only of an unbiased observer, but also of the biased litigant who is desperately searching to find a flaw in the judge's conduct."

Remarks by a judge that wrongly suppress critical evidence can alter the course of the trial and the outcome, as well. The attorneys developing their cases in the courtroom under our adversary system should not be unreasonably restrained from offering relevant evidence to try to convince either the courts or juries to decide in their favor. "The right to present evidence is, of course, essential to the fair hearing required by the Due Process Clause" of the United States Constitution. *Jenkins v. McKeithen,* 395 U.S. 411, 429, 89 S.Ct. 1843, 1853, 23 L.Ed.2d 404 (1969).

In this case, we are called upon to decide whether Mrs. Ricker was forced to forego some evidence or restrict her tactics, to determine whether she did not call an important witness, or did something or did not do something that she would have done had it not been for the judge's remarks that she interpreted as a threat. She must, in order to prevail, show some nexus between the alleged improper comment and the course of the trial. We can find no such nexus here. After the judge's remark, Mrs. Ricker's counsel asked one more question, received an answer, and then rested the case. He made no motions thereafter, called no more witnesses, nor did he make a proffer as to what further evidence he had in the wings that he wished to present. He simply acquiesced to the judge's admonition. Nothing in the record allows this Court to conclude, or even to surmise, what evidence Mrs. Ricker was precluded from presenting, much less how the hearing was affected.

In her brief, Mrs. Ricker alleges that the "substance of the evidence was apparent from the context." We can find no apparent evidence. Nor did Mrs. Ricker, later in the case, or after the final ruling, present the lower court with evidence that she wants this court to conclude she was chilled from presenting. It would be an enormous leap for this Court to conclude that, because Mrs. Ricker's counsel was chilled in his presentation of his client's case, she was, consequently, prevented from offering crucial or significant evidence. By giving this Court nothing in the record to consider, Mrs. Ricker has failed to preserve the issue for appellate review. In *Magness v. Magness,* 79 Md.App. 668, 558 A.2d 807 (1989), this Court expressed its reservation about establishing a rule of law where the appellant did not make a good faith effort to be heard. *Id.* at 686, 558 A.2d 807. In this case, we find that Mrs. Ricker did not make a good faith attempt to be heard either at trial or at any other time and, therefore, we cannot find, on the record she that has presented us, any due process denial resulting from the court's remarks.

In anticipation of the shortfall, Mrs. Ricker's brief asks us to relieve her from the responsibility of proffering the evidence that she maintains she was intimidated into not presenting. She argues that she was "suddenly faced with an election between on the one hand, protection from an abusive spouse, on the other hand, losing her child by decree of court. She made the election to remain mute and forego the protection and now seeks relief from the Solomonesque predicament that was not of her making."

Judges go about their duties with widely different styles and approaches. Some are stern and aloof; some, at the other extreme, are relaxed and friendly. Some remain detached during court proceedings; others become involved. The law is tolerant of the variations. Attorneys must adapt to the variations and cannot expect that appellate courts will enforce a single standard of behavior or style on the trial judges of this State. This trial judge, as we can see from the record, was clearly involved, and revealed to both counsel how he was reacting to the evidence. His doing so, in general

terms, however, certainly did not come close to trespassing into the area where his conduct violated the rights of either litigant. One aspect of advocacy is the necessity of appearing before judges with predilections contrary to those of the litigants. Confronting judges, from time to time, who are predisposed against a client's case, is an unavoidable part of the litigating attorney's life.[1] As this Court stated in *Magness*, "A judicial determination of constitutional validity must be pursuant to an honest and *antagonistic* assertion of rights." *Magness*, 79 Md.App. 668, 686, 558 A.2d 807 (1989) (emphasis added).

In the case at hand, calling the judge's attention to the effect of his comments could reasonably be expected to incur the judge's displeasure or maybe even wrath. This is a familiar dilemma for practicing attorneys. Mrs. Ricker and her attorney chose to endure the judge's remarks without contemporaneous complaint, probably in the hope that the worst had already occurred and that she could try to salvage what remained of her chances to prevail. By choosing that course, she has left us with a record that does not disclose, or even hint at, what evidence she could have offered or the tactics she did not pursue.

Choosing to challenge the judge during the hearing was not the only course open to her. She could have supplemented the record by filing a motion for a new trial under Maryland Rule 3–533 or by filing a motion to alter or amend a judgment under Rule 3–534. *See Zdravkovich v. Bell Atl.–Tricon Leasing*, 323 Md. 200, 592 A.2d 498 (1991). In either of these motions, Mrs. Ricker could have attested to the evidence that the judge's remarks intimidated her into foregoing. Had she

---

1. "A variety of scenarios can arouse the ire of a judge, and common courtroom occurrences can be made more difficult by argumentative, overbearing, intrusive, or inappropriate behavior ... A practicing attorney must keep in mind, however, that all judges—including the difficult ones are different. Any given response may work well in one situation and not in another. Consequently, an attorney must find the prudent response for each situation which arises." *Dealing with Judges and Court Personnel*, 55 Am.Jur. Trials 443, 467 (1995).

done so, that may have given us a different record. We cannot say one way or the other. Absent a record of any significant evidence, even if we assume that the trial judge's remarks did intimidate her, we cannot conclude that those remarks had any effect whatsoever upon the outcome of the case.

Finally, we come to the issue of whether the trial court erred in refusing to allow Mrs. Ricker to introduce evidence of Mr. Ricker's alcohol abuse. Once again, we find that the trial court did not err.

Both parties presented some evidence as to Mr. Ricker's alleged alcohol problem. Mr. Ricker testified on direct examination as follows:

Q. Do you have a drinking problem?

A. No sir.

Q. Do you drink?

A. Yes sir.

Q. How often?

A. I might have a glass of wine with dinner, as [Appellant] did. I'd have a beer if I was going out with associates.

On cross-examination, Mrs. Ricker's counsel asked:

Q. Mr. Ricker, when you left the Ashley facility [rehabilitation institution], were you told not to drink alcohol?

A. No. They don't tell you to do anything; they suggest that you do things.

COURT: "Counsel, Counsel, Counsel! Domestic violence is the name of the case. Let's concentrate on that."

At that point, Mrs. Ricker's counsel ceased further interrogation on the subject of alcohol abuse. He did not object to the court's admonition on the line of questioning and, therefore, did not preserve the issue. *Magness v. Magness,* 79 Md.App. 668, 686, 558 A.2d 807 (1989).

The real problem here is that Mrs. Ricker was unhappy with the judge's lack of interest in Mr. Ricker's use of alcohol. Counsel obviously sensed that the judge was not interested,

and abandoned the inquiry. The judge had the opportunity to determine the credibility of witnesses and come to his own conclusion about what and whom to believe and what he wanted to hear. Due Process does not require that the litigant be satisfied with the result. *Wagner v. Wagner,* 109 Md.App. 1, 23, 674 A.2d 1 (1996).

In conclusion, we hold that, on the record before us, we cannot find that appellant has demonstrated that the circuit court's denial of her motion for a protective order was in error, and we affirm.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**