762 A.2d 198

Sergey KATSENELENBOGEN

v.

Janet KATSENELENBOGEN.

No. 2840, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Nov. 14, 2000.

318

320

Stuart H. Grozbean (Belli, Weil & Grozbean, P.C., on the brief), Rockville, for appellant.

David R. Bach, Rockville, for appellee.

Argued before EYLER, THIEME and THEODORE G. BLOOM (Ret., specially assigned), JJ.

EYLER, Judge.

Appellant, Sergey Katsenelenbogen, appeals from a protective order entered by the Circuit Court for Montgomery County in favor of appellee, Janet Katsenelenbogen, pursuant to the Maryland Domestic Violence Statute, Md.Code (1999 Repl.Vol.) §§ 4–501 et seq. of the Family Law Article ("FL"). Appellant contends that (1) the evidence was legally insufficient to support the issuance of a protective order and (2) if appellee was entitled to some relief, the relief granted was not supported by the evidence. We hold that (1) if the basis is fear of imminent serious bodily harm, the fear must be reasonable and (2) the relief must be tailored to the situation being addressed. As a result, we vacate the order and remand for further consideration.

## Factual Background

The parties were married in April 1986, and had three children as a result of the marriage. The marital home was titled in the names of both parties. Appellee was a pediatric nurse and worked approximately 24 hours per week. Appellee had a chronic back problem, for which she took medication. The parties had a live-in nanny who helped to care for the minor children.

On or about December 9, 1999, appellee asked appellant to move out of the marital home. Appellant did not leave.

On January 1, 2000, appellant advised the live-in nanny that she was fired and would have to vacate the marital home because appellant wanted to use the room that she had been occupying. When appellee learned of this, she disapproved, and after consulting her lawyer, took the position with appellant that he could not force the nanny to leave.

During that conversation between the parties, appellant used the cordless telephone to call the police. While making the call, appellant walked out of the house onto the driveway, and appellee followed him. One of the parties'. children, Alexander, age 9, followed appellee. After appellant finished his conversation with the police, he dialed another number and

began speaking in Russian. Appellee continued to request the phone, and according to appellee, appellant shoved her by placing his left hand on her shoulder. Also, according to appellee, Alexander placed himself between them, and appellant shoved Alexander. Appellant testified that appellee followed him, but he denied any contact. Prior to January 1, 2000, appellant had never harmed appellee or contacted her in an improper or offensive manner.

On January 3, 2000, appellee filed a petition for protection from domestic violence. In that petition, she stated that she was filing it on behalf of herself and Alexander, claiming, "shoving," "threats of violence," and "mental injury of a child." An attachment to the petition described the incident which occurred on January 1. An ex parte order was issued on January 3, and a hearing was scheduled for January 10.

At the hearing on January 10, appellant and appellee testified. At the conclusion of the hearing, the circuit court issued a protective order, reciting that appellee was a person eligible for relief as the current spouse of appellant, and that on January 1, during a verbal argument, appellant shoved appellee and their nine-year-old son. The order recites that "she was badly shaken. Is afraid for her safety." The protective order was a printed form completed and executed by the court. The form described acts of abuse with boxes beside them. The only box checked as an act of abuse was described as an act "which placed person eligible for relief in fear of imminent serious bodily harm."

By its terms, the order was effective until January 3, 2001; appellant was ordered not to contact appellee except for purposes of visitation; appellant was ordered to vacate the marital home; custody of the three minor children was awarded to appellee; emergency family maintenance was awarded to appellee; and exclusive use and possession of a certain vehicle was awarded to appellee.

We shall set forth in detail the testimony of appellee and the findings of the trial court in order to discuss the issues presented.

## Discussion

Family Law § 4–506(c)(ii) provides that a court may grant a protective order to any person eligible for relief from abuse if the court finds *by clear and convincing evidence that the alleged abuse has occurred.* Section 4–501 states that abuse means "(i) an act that causes serious bodily harm; (ii) an act that places a person eligible for relief in fear of imminent serious bodily harm; (iii) assault in any degree; (iv) rape or sexual offense as defined by Art. 27, §§ 462 through 464C of the Code or attempted rape or sexual offense in any degree; or (iv) false imprisonment." We are concerned only with (ii), as that is the finding made by the circuit court as the sole basis for the protective order. The petition and order were based on the January 1 incident. Under the statute, therefore, to support the issuance of a protective order in this case, there must be evidence to support a finding that on January 1 appellee was in fear of imminent serious bodily harm.

Appellee testified in pertinent part as follows:

[Appellee's Counsel]:

Q You filed a petition for protection from domestic violence in this Court on January 3rd, that is correct?

A Correct.

Q And where did the events occur which you describe in the petition?

A At Lautrec Court, at our home.

Q And on what date did those events occur?

A New Year's Day, January 1st.

Q At about what time?

A 2:30 in the afternoon.

Q And what happened at 2:30 in the afternoon?

A I returned home with my children from my mother's house. We had spent New Year's Eve there. I got out of the car. My nanny appeared to be very upset, and she said she needed to talk to me.

I pulled her aside so that we could speak privately. She told me that my husband had told her that she needed to

move out, that although he like[d] her that she would need to go, that her services would no longer be required.

. . .

Q What happened after your conversation?

A After our conversation I learned that she was to be terminated. I then went and called [appellee's counsel]. I was in a panic because this is somebody that I have come to depend on. This is somebody that I care about deeply.

This is someone that my children love, and that she loves them, and I trust with my children, and I didn't know whether he could make her leave or not make her leave, legally.

Q Did you want her to leave?

A I did not want her to leave, and I was scared to death that she was going to, and I didn't know where that was going to lead.

You know, so I called you to find out what—what my legal rights were. You said that I hired her, and as long as I was paying her that he could not make her leave the home.

After learning this—and you also said that it depended on how much she could tolerate. I explained this to her. I told her that I needed her to stay. I really wanted her to stay.

I walked upstairs. My husband was in the bathroom. I sat on the edge of the bed and waited for him to come out. He came out. I told him that I had learned of his intention to let Nanette go—Nanette is our nanny—and that I wanted her to stay, that I needed her there, and he said that she had to go, and I said, "Well, I hired her. I've been paying her. I need her services, and I need her help. I depend on her and she's not leaving."

He said, "Yes she is."

I said, "No, she's not."

We went back and forth two or three times. He said, "Okay, do you want to do this now, or would you like to do this later?"

I did not know what he meant by that, but I said, "I want to do it now."

He picked up the cordless phone and started walking down the stairs. I started following him. He told me to get away from him. I asked him what he was doing. He said he was calling the police.

I followed him down the stairs as he was calling the police. As we got downstairs to the foyer, my nine-year-old son then joined us. He exited the house. [He was] [o]n the phone with the police while I was repeatedly requesting for him to give me the phone.

He was telling them that he had an employee that he had fired that was refusing to leave the home, that he wanted her—the police to come and remove her from the house.

He said, "Please come quickly because the situation could escalate, and there could be some possible violence." Which I took to be a threat.

. . .

I continued to follow him down the driveway, and I asked him to hand me the phone so I could speak to the police.

He said, "I will give you the phone when I'm done speaking to the police."

The whole time he was shouting profanities at me. He then hung up with the police and began to dial another number. He began speaking in Russian. Again, I requested that he hand me the phone.

Q Do you speak Russian?

A No, I do not. I assume he was speaking with his mother. I was facing him. He had the phone in his right hand. He shoved me with his left hand, which set me off balance.

Q Where did he touch you?

A He touched me on my right shoulder.

Q Okay.

A And shoved me. At that point my son dove in between us. He then shoved my son out of the way. At that point I—the adrenalin started running.

I ran over [to] my neighbor's house. They asked if I was okay. I told them I really didn't know, but I needed to use the phone, and I need[ed] to use it immediately, and they handed me the telephone and left the room to give me privacy to talk.

My son was with me at their house. I called the police and told them what happened from my perspective and that he had shoved me. The police—the lady—or the dispatcher told me that there was already a car in route, but that she would call them and let them know the situation, and to stay at the neighbor's house until the police got there.

[APPELLANT'S COUNSEL]: Object to what ever [sic] the police told her, again.

THE COURT: Sustained.

THE WITNESS: Okay. At that point I was waiting for the police, but I was concerned because Nanette was still in the house with him, and he also reeked of alcohol.

I had—I asked my neighbor to go over there to tell Nanette to come over to their house. As we opened the door we saw Nanette standing in the driveway. I flagged her back, and I'm sorry, Your Honor, but I forgot one part of it.

After he shoved me and my son, he then placed the phone in the crook of his neck, stuck his hands in his pockets, smiled sarcastically, and said, "See, I didn't even"—

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Overruled. This is what he Mr. Katsenelenbogen—

[APPELLANT'S COUNSEL]: The term sarcastic is what my—

THE COURT: Overruled.

THE WITNESS: And he said, "See, I didn't even touch you. I didn't even touch you. My hands were in my pocket[s]. I didn't even touch you."

He went into the house saying, "I didn't even touch you."

Anyhow, at that point Nanette came over to their house and we waited for the police officers to arrive. They interviewed Nanette. They interviewed my husband, and they interview[ed] myself.

They said that they—

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Sustained.

THE WITNESS: I'm sorry. They did not interview my son. They wanted to call an ambulance because at that point I was feeling faint and I was badly shaken. I declined.

[APPELLANT'S COUNSEL]: Objection. How would she know what they wanted to do or not do?

THE COURT: Overruled.

THE WITNESS: Okay. They stated that they wanted to call an—

THE COURT: All right, well just tell me what happened.

THE WITNESS: I stuck my—I got a glass of water, put my head between my legs and waited, and the police at that point asked me if I had somewhere to go because they said that my husband did not.

[APPELLANT'S COUNSEL]: Objection.

THE COURT: All right. Just tell me what you did. What happened?

THE WITNESS: I'm sorry. I'm a little nervous. At that point I told the police that I could go to my parents' house. I requested that they stay with me while I packed my things.

They agreed to do so. I packed—but they said they couldn't—

[APPELLANT'S COUNSEL]: Objection.

THE WITNESS: Oh, sorry. They—I packed everything into the car for the three kids. I stuck all three kids in the car. I packed the pet rabbit and the dog because I didn't know what he would do to them.

I had actually tried to—

[APPELLANT'S COUNSEL]: Objection.

THE COURT: All right. So you went to your parents' house. Have you been there since this—since January 1st? Or have [you] returned to the—

THE WITNESS: Have returned to my—no, I returned to my own home after I got the order—restraining order.

THE COURT: Okay.

THE WITNESS: But—I'm sorry.

[APPELLEE'S COUNSEL]:

Q Has your husband ever physically touched you like that before, or harmed you in any way like that?

A He has not physically touched me before. He has displayed violent behavior and anger control problems before. There are several holes in our wall. He did try to kick my dog, and fortunately missed. Had he got him, he most certainly would have killed him.

[APPELLANT'S COUNSEL]: Objection. Draws a conclusion.

THE COURT: Sustained.

THE WITNESS: There are several holes in the wall. He has been calling me, using profanity in front of the children. He has exhibited anger and threatened to throw things against the wall in front of the children.

I arrived home one night, after he had come back from a long trip, and he was not giving me any money—

[APPELLANT'S COUNSEL]: Objection. Time frame.

THE COURT: When was this?

THE WITNESS: Just about a couple of days before the January 1st event.

I told him—I called—I told him that if he wanted food in the house that he would have to buy it becau he wasn't

giving me any money and I did not have enough to buy food for the children, and he left to go grocery shopping.

While he was out, I had forgotten to ask him to buy litter for the rabbit. I did have $2.50 in my wallet. I came home with the litter. He started shouting at me, in front of children, that, "You have money to buy litter for the rabbit, but you don't have money to feed our children."

He starts pulling things out of the trash can, saying, "See, this only costs $1.39. See, this only costs $.69."

. . .

[APPELLEE'S COUNSEL]:

Q Are you afraid for your safety due to your husband's conduct on January 1st?

A I am, and the fact that he also, on other occasions, has been—

[APPELLANT'S COUNSEL]: Objection. Not responsive.

THE COURT: Overruled.

THE WITNESS:—and has been drinking alcohol, and acting—behaving irrationally.

[APPELLEE'S COUNSEL]:

Q Do you believe your physical safety will be in jeopardy unless the Court grants your request for protective order?

A I do.

Q Are you requesting this Court grant your request for protective order?

A I am.

. . .

[APPELLANT'S COUNSEL]:

Q And looking at the incident that you have described, when he came out of the shower, you were sitting there, isn't that correct—on the bed?

A I don't know that he came out of the shower, he came out fully dressed, but I was sitting on the edge of the bed, correct.

Q Did he hit you at that time?

A No he did not.

Q And then he went to grab the telephone and you pursued him, yes or no?

A I followed him. I wanted to hear what he was going to do.

Q And you were going down the steps and he was going down the steps, and you were following him down the steps?

A I was walking down the steps. I wanted to hear what he was going to do, yes.

Q Okay, and he told you to get away from him, didn't he?

A He did.

Q And did you listen to him?

A No, because—

Q Thank you.

A —I needed to know what he was going to tell the police.

Q But you didn't have to follow him, did you?

A I felt I did.

Q You felt you did.

A I felt I did.

Q Because you knew that he was going to hit you.

A No—

[APPELLEE'S COUNSEL]: Objection.

THE WITNESS:—because I needed to protect my children.

[APPELLANT'S COUNSEL]:

Q Protect your children? He was walking out of the house, out of the door, isn't that correct?

A Yes, and the children were there.

Q And he was trying to get away from you wasn't he?

A He was trying to get away from me so I wouldn't [hear] what he was telling the police.

Q And you pursued him.

A And I pursued him because I did not want my children to see someone they loved dragged out of the house.

Q And did you—so you agree. You didn't need. to follow him?

A Yes, I did need to follow him.

Okay. Did anything stop you from picking up a phone, or going to a neighbor's house, or using some other phone? Yes or no?

A Well, I attempted to hang up our phone on another line, but it did not work, and I didn't see a reason to run to the neighbors because he told me that when he was finished talking to the police he was going to hand me the phone.

Q And you were in fact, at all times though this whole incident, pursuing your husband who was not pursuing you?

A That is correct—

Q Thank you.

A —but that does not justify putting your hands on someone else's person.

Q And you were trying to get the phone. You were trying to give him the phone, isn't that correct?

A No, that is not correct.

Q You weren't trying to get the phone?

A No. I was following him and I repeatedly asked him for the phone.

Q So you weren't trying to get the phone? Yes or no?

A I did not touch his person. I was attempting verbally to get the phone.

. . .

[APPELLEE'S COUNSEL]:

Q Did you do anything to encourage your husband to strike you?

A No, I did not.

Q And your husband had never hit you before, correct?

A No, he'd never hit me, but he has—as I told the Court before, displayed violent behavior many many times.

. . .

Q Did you pursue him anticipating that he would strike you?

A No, I did not.

The court concluded:

All right. Well, as I said at the conclusion of the case, the legislature has seen fit to pass this law that will require the Court to act if they are convinced that there is clear and convincing evidence that there is perhaps a situation which may become volatile or result in something happening where someone is injured, and I think that there is a volatile situation here, unfortunately, and I don't know what the cause of it is.

I don't know if it is the extra-marital affair or if it is the alcoholic consumption, or what it is, but obviously these folks are not getting along.

By both testimonies, Mr. Katsenelenbogen is going to move to another place in the house, so obviously the marriage is not going well, and again, I understand that he wants a reconciliation; perhaps she doesn't; perhaps when this matter gets into Court the grounds for the divorce may well lie with Mr. Katsenelenbogen, but until that happens, I think these folks should be separated.

I am convinced that there was a voluntary separation on this incident and that Ms. Katsenelenbogen was in fact shoved, and I will grant the protective order.

This has no bearing on the final outcome of this case whatsoever. This is merely a band-aid attempt to separate these folks so nobody gets hurt, but it is not a situation where Mr. Katsenelenbogen is going to lose everything or whatever as a result of this hearing because I am going to put on here that it is without prejudice and should not have any bearing on the ultimate decision as to the merits hearing, both on the monetary and the award of custody, but I am going to grant the protective order that will remain in effect through January 3 of the year 2001, that there should be no contact between the petitioner and the

respondent, and [the respondent] shall vacate the family home, which I will grant a use and possession, at this time, to the petitioner, without prejudice.

Again, I suggest that the matters be filed immediately so this can get on for a full hearing. I will indicate that the residential custody of the minor children be awarded to the petitioner at this time, that is residential, and that liberal visitation be granted to the respondent without the consumption of alcohol, and again this would be without prejudice to the respondent seeking custody of the children, and I will also order that family maintenance in the amount of $2,000.00 be paid commencing February 1st, the year 2000, that the exclusive use and possession of the Toyota Previa be awarded to the petitioner, and that if there are any firearms, that all firearms be surrendered to the Montgomery County Sheriff's Department.

Victims of domestic violence are not limited to a particular age or gender, but such violence is a particular threat to women. *See* Philip C. Crosby, *Custody of Vaughn: Emphasizing the Importance of Domestic Violence in Child Custody Cases*, 77 B.U.L.Rev. 483, 483 (1997). Women are "more likely to be assaulted and injured, raped, or killed by a current or ex-partner than by all other types of assailants combined." *Id.* (citing Council on Scientific Affairs, Am. Med. Ass'n, *Violence Against Women: Relevance for Medical Practitioners*, 267 JAMA 3184, 3185 (1992)). Domestic violence also has a grave impact on children in our country, with between 3.3 to 10 million children witnessing domestic violence each year. *See* Marlene Rapkin, *Note: The Impact of Domestic Violence on Child Custody Decisions*, 19 J. Juv. L. 404, 404 (1998) (citing *Domestic Violence Statistics*, PAC. BUS. NEWS, Nov. 17, 1997, *available in* 1997 WL 15021813). Studies have shown that children from homes in which domestic violence occurs are more likely to experience a variety of other problems, including substance abuse, gang activities, eating disorders, nightmares, peer and school related difficulties, and suicidal tendencies. *Id.* (citing *Domestic Violence Statistics*,

PAC. BUS. NEWS, Nov. 17, 1997, *available in* 1997 WL 15021814).

■ Maryland enacted the Domestic Violence Act in 1980 by Chapter 887 of the Acts of 1980. It has been codified as part of the Family Law Article since 1984. *Kaufman v. Motley,* 119 Md.App. 623, 624 n. 1, 705 A.2d 330 (1998). As discussed in *Kaufman,* the purpose of the Domestic Violence Act is to provide immediate protection:

> That the Act was designed to aid victims of domestic abuse by providing an immediate and effective nonmonetary remedy is readily apparent. To this end the legislature empowered courts to order that . . . specified protective devices be implemented, all to protect the victims' immediate and future safety.

119 Md.App. at 630–31, 705 A.2d 330 (quoting *Barbee v. Barbee,* 311 Md. 620, 623, 537 A.2d 224 (1988)).

Because of the widespread occurrence of domestic violence and the frequent catastrophic effect, preventive measures to halt the occurrence of further violence are to be applauded. For those same reasons, allegations of domestic violence are very serious, and the issuance of a protective order normally carries with it grave consequences for the perpetrator. If a protective order is issued without a sufficient legal basis, those consequences frequently cannot be erased. In that situation, the alleged perpetrator may suffer unfairly from the direct consequences of the order itself, which may include removal from his or her home, temporary loss of custody of his or her children, or temporary loss of a family car. *See* F.L. § 4–506. The alleged perpetrator may also suffer from the social stigma that attaches to the order.

■ With respect to direct consequences, the de facto effect on custody is an example. A protective order does not award permanent custody of children. *See Coburn v. Coburn,* 342 Md. 244, 253, n. 8, 674 A.2d 951 (1996)(noting that "[f]iling a petition for protection from abuse does not initiate divorce proceedings [or] award permanent custody of children . . . .")(citing Christopher L. Beard and Jacqueline J. Judd,

*Victims No More: Changes in Domestic Violence Law,* 24 THE MARYLAND BAR JOURNAL 29, 30 (July/ August 1992)). Section 4–506(d)(6) of the Family Law Article merely authorizes a temporary custody award. Despite that, the granting of a protective order can have long-range effects on child custody.

In making child custody determinations, a court weighs numerous factors, including the fitness of the parents, the character and reputation of the parties, and the length of separation of the child from the natural parents. *Best v. Best,* 93 Md.App. 644, 655–56, 613 A.2d 1043 (1992). A trial court might consider the issuance of a protective order against one parent when looking at any of these factors. In addition, a court may also consider the effect on the child's stability caused by a change in residence. *See Mitchell v. Mitchell,* 61 Md.App. 535, 542–43, 487 A.2d 680 (1985). In *Levitt v. Levitt,* 79 Md.App. 394, 397–98, 556 A.2d 1162 (1989), the Court stated:

> The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the child. To justify a change in custody, *a change in conditions must have occurred which affects the welfare of the child and not of the parents.* The reason for this rule is that the stability provided by the continuation of a successful relationship with a parent who has been in day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of a custodial change. In short, when all goes well with children, stability, not change is in their best interests.

(Quoting *Sartoph v. Sartoph,* 31 Md.App. 58, 66–67, 354 A.2d 467 (1976) (alteration in original)). *Levitt* dealt with a change in custody, not an original award of custody. The Court stated that they are different situations because of the child's need for continuity which arises in the former and not in the latter. *Id.* As the *Levitt* Court stated, "if a child is doing well in the custodial environment, the custody will not ordinarily be changed." *Id.* at 398, 556 A.2d 1162.

Furthermore, in making a child custody determination, if a trial court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court must specifically find that there is no likelihood of further child abuse or neglect by the party in order to award custody or visitation rights to the party, except for a supervised visitation arrangement. F.L. § 9–101. A protective order issued by a court that states that one parent abused his or her child pursuant to F.L. § 4–501 would give a trial court reasonable grounds to believe that the child had been abused.

The legislature recently added new grounds for absolute divorce based on cruelty of treatment and excessively vicious conduct. F.L. § 7–103(a)(7); (a)(8). Prior to the new law, most domestic violence victims could only file for a limited divorce in Maryland if domestic violence served as the grounds on which the divorce was to be based. *See* Melony J. Ellinger, Ruth Ann Lane, & Gregory P. Jimeno, *Recent Developments: Maryland General Assembly Update*, 28 U. Balt. L.F. 43, 44 (1998). As amended, the new law allows an absolute divorce to be granted if it can be proved that there was cruelty of treatment or excessively vicious conduct toward the complaining spouse and there is no reasonable expectation of reconciliation. *Id.* A significant feature of the law is that there is no required waiting period. Accordingly, the party meeting the requisite burden of proof of cruelty or vicious conduct can obtain an absolute divorce immediately. *Id.* Similar to the child custody determination situation, a protective order that states that one spouse has abused the other pursuant to FL § 4–501 might be considered by a trial court in granting an absolute divorce on the basis of either cruelty of treatment or excessively vicious conduct.

The divorce, alimony, and custody provisions in the Family Law article, temporary and permanent, are designed to deal with issues relating to divorce, child custody, visitation, support, marital home, and other monetary issues. The domestic violence statute, unfortunately, could be used to seek an advantage with respect to issues properly determined in a divorce, alimony, or custody proceeding. A trial judge fre-

quently has to make difficult decisions and this area is perhaps more difficult than many others. The court must look to the criteria provided by the Legislature. According to § 4–506(c), protective orders may be issued only if there has been at least one act of abuse as defined in § 4–501. Section 4–501(b) provides:

*Abuse.*—(1) "Abuse" means any of the following acts:

(i) an act that causes serious bodily harm;

(ii) an act that places a person eligible for relief in fear of imminent serious bodily harm;

(iii) assault in any degree;

(iv) rape or sexual offense as defined by Article 27, §§ 462 through 464C of the Code or attempted rape or sexual offense in any degree; or

(v) false imprisonment.

(2) If the person for whom relief is sought is a child, "abuse" may also include abuse of a child, as defined in Title 5, Subtitle 7 of this article. Nothing in this subtitle shall be construed to prohibit reasonable punishment, including reasonable corporal punishment, in light of the age and condition of the child, from being performed by a parent or stepparent of the child.

(3) If the person for whom relief is sought is a vulnerable adult, "abuse" may also include abuse of a vulnerable adult, as defined in Title 14, Subtitle 1 of this article.

■ The abuse must be proved by clear and convincing evidence. *See Piper v. Layman,* 125 Md.App. 745, 754, 726 A.2d 887 (1999)(citing *Ricker v. Ricker,* 114 Md.App. 583, 586, 691 A.2d 283 (1997); FL § 4–506(c)(1)(ii)). In Maryland, the clear and convincing standard of proof is an intermediate standard, requiring more than a preponderance of the evidence, but less than evidence beyond a reasonable doubt. *Weisman v. Connors,* 76 Md.App. 488, 504–05, 547 A.2d 636 (1988). The Maryland Civil Pattern Jury Instruction on the clear and convincing standard of proof provides, in part:

To be clear and convincing, evidence should be "clear" in the sense that it is certain, plain to the understanding, and

unambiguous and "convincing" in the sense that it is so reasonable and persuasive as to cause you to believe it. But you need not be convinced beyond a reasonable doubt. MPJI 1:8 (3rd ed.1998). If that burden is met, the court "may issue a protective order tailored to fit particular needs that the petitioner has demonstrated are necessary to provide relief from abuse." *Piper,* 125 Md.App. at 754, 726 A.2d 887 (citing *Ricker,* 114 Md.App. at 586, 691 A.2d 283).

When we review cases in which conflicting evidence was presented, we must accept the facts as determined by the trial court unless such findings were clearly erroneous. *See id.* (citing Md. Rule 8–131(c); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990)); *Innerbichler v. Innerbichler,* 132 Md.App. 207, 230, 752 A.2d 291 (2000)(stating that the trial court's findings are not clearly erroneous when they are supported by substantial evidence) (citations omitted). In making this determination, "we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefore, tending to support the factual conclusions of the lower court." *Mercedes-Benz of North America, Inc. v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993)(citing *Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 353–54, 517 A.2d 1122 (1986)). As for the final conclusion, however, "we must make our own independent appraisal by reviewing the law and applying it to the facts of the case." *Piper,* 125 Md.App. at 754–55, 726 A.2d 887 (citing *Aiken v. State,* 101 Md.App. 557, 563, 647 A.2d 1229 (1994)). This Court may substitute its judgment for that of the circuit court if our interpretation of the relevant legal principles is different. *See Meyers v. Montgomery County Police Dep't,* 96 Md.App. 668, 689, 626 A.2d 1010 (1993)(citing *Perini Serv., Inc. v. Maryland Health Resources Planning Comm'n,* 67 Md.App. 189, 201, 506 A.2d 1207 (1986)).

In the case before us, appellee did not testify that she was in imminent fear of serious bodily injury at the time of the shoving on January 1, 1999. The court presumably inferred from her testimony describing the incident, coupled with her

testimony with respect to appellant's prior behavior, particularly when under the influence of alcohol, that she in fact had such fear. This raises the question of whether an actual fear is sufficient.

The relevant definition of abuse is "an act that places a person eligible for relief in fear of imminent serious bodily harm." F.L. § 4–501(b)(ii). This is capable of being read as a subjective test, *i.e.,* how did the alleged victim perceive the event. Such a subjective test could produce unreasonable results because petitioner's statement that he or she experienced fear of imminent serious bodily harm would be sufficient, whether or not the physical or verbal act in question would generally be of the type to elicit such a response. We reject appellee's argument that a subjective test is mandated and hold that a trial court should consider whether there was a reasonable basis for the perceived imminent serious bodily harm.

All other categories of abuse, as set forth in § 4–501, have some indicia of reliability. The abuse category most analogous to the "fear of imminent serious bodily harm" category is assault. § 4–501(b)(iii). The assault category appears to be a reference to criminal assault because the statute refers to "assault in any degree." *Id.; see* Md.Code (1996 Repl.Vol., 2000 Supp.), § 12A (Second Degree Assault); § 12A–1 (First Degree Assault); *Robinson v. State,* 353 Md. 683, 694, 728 A.2d 698 (1999)(stating that the assault statutes enacted in 1996 "created degrees of assault unknown to the common law, and while retaining the common law elements of the offenses of assault and battery and their judicially determined meanings, the statutes repealed the statutory aggravated assaults and created new offenses."); *Streater v. State,* 352 Md. 800, 820 n. 9, 724 A.2d 111 (1999)(stating that "[t]he Maryland criminal code recognizes two types of assault; second degree assault, § 12A, and first degree assault, § 12A–1 . . . .").

Criminal assault requires that the fear be reasonable. *See Barrios v. State,* 118 Md.App. 384, 403, 702 A.2d 961

(1997)(involving a case in which appellant was convicted of two counts of assault with intent to prevent lawful apprehension, and holding that "[a] rational trier of fact could reasonably conclude that [appellant's] conduct placed the officers in *reasonable* apprehension of immediate bodily harm . . . .")(emphasis added); *Lamb v. State,* 93 Md.App. 422, 442, 613 A.2d 402 (1992)(involving a criminal assault charge, and stating that assault of the intentional threatening variety "is a fully consummated crime once the victim is placed in *reasonable apprehension* of an imminent battery.") (emphasis added); *Dixon v. State,* 302 Md. 447, 458–59, 488 A.2d 962 (1985)(stating that the assault "attempt is made whenever there is any action or conduct *reasonably* tending to create the apprehension in another that the person engaged therein is to apply such force to him.")(emphasis added)(quoting *Lyles v. State,* 10 Md.App. 265, 267, 269 A.2d 178 (1970)).

Even if the assault category in the Domestic Violence Act encompasses civil assault, reasonableness may still be an element. *Compare* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 10, at 44 (5th ed.1984)(stating that in assault cases, courts "have often stated that the apprehension must be one which would normally be aroused in the mind of a reasonable person.") *with Restatement (Second) of Torts* § 27 (1965)(positing the proposition that "[i]f an act is intended to put another in apprehension of an immediate bodily contact and succeeds in so doing, the actor is subject to liability for an assault although his act would not have put a person of ordinary courage in such apprehension."), *and Lee v. Pfeifer,* 916 F.Supp. 501, 505–06 (D.Md.1996)(stating that to find liability for the tort of assault in Maryland, one element that must be satisfied is that the defendant's actions must have raised an apprehension of imminent bodily harm in the plaintiff's mind, and that element is "measured by an entirely subjective standard.")(citing *Restatement* § 27).

It was noted in *Kellum v. State,* 223 Md. 80, 85, 162 A.2d 473 (1960), that assault "has substantially (if not exactly) the same meaning in our law of torts as in our criminal law." The Civil Pattern Jury Instruction, No. 15:1 (3rd ed.1984, 2000

Cum.Supp.) indicates that reasonableness is an element. It provides:

> An assault is an intentional threat, either by words or acts, to physically harm another person without that person's consent. Actual contact is unnecessary. However, it must appear to the other person that the one making the threat has the present ability to carry it out and the person threatened must be put in *reasonable* fear of imminent harm.

(Emphasis added). While it appears, therefore, that civil assault requires that the fear or apprehension be reasonable, we need not decide that issue because it is not before us.

 Even if reasonableness is not an element in the assault category of abuse, intent to cause fear or offensive contact, unlike the category before us, is an element. As stated above, the category of abuse before us is defined simply as "an act that places a person eligible for relief in fear of imminent serious bodily harm." § 4–501(b)(ii). By the plain meaning of this provision, this category of abuse does not require any proof of the defendant's intent. Accordingly, each of the other four categories of assault carry with them some sort of objective factor that helps to give the category some indicia of reliability and to reduce the likelihood of a bogus claim.[1]

 Consequently, we conclude that subsection (ii) requires more than actual fear. We hold that the fear must be reasonable, i.e., the conduct must be such as to cause a reasonable person under the same or similar circumstances to

---

1. A tortious assault is defined as "any unlawful attempt to cause a harmful or offensive contact with the person of another or to cause an apprehension of such contact." *Continental Cas. Co. v. Mirabile*, 52 Md.App. 387, 398, 449 A.2d 1176 (1982). What constitutes an "offensive contact" could obviously mean vastly different things to different people, if it was defined by a subjective test. As we stated in *Pettit v. Erie Insurance Exchange*, 117 Md.App. 212, 224, 699 A.2d 550 (1997), however, what constitutes an offensive contact is defined by a community standard, and as such "is offensive if it offends a reasonable sense of personal dignity." (quoting Restatement (Second) of Torts § 19 (1965)).

fear serious bodily harm. The circumstances include but are not limited to the age, intelligence, gender, health, and physical attributes of the parties.[2] In this case, there is no indication that the trial court applied an objective standard, and in the absence of controlling case law, no reason to presume it did so.

 The domestic violence statute was not intended as a vehicle to produce *pendente lite* orders relating to custody, support, and marital property, effective for a year, as a substitute for the generally applicable Family Law provisions. Rather, it is meant to protect victims of domestic violence, and when the legislative standard is met, there need be no hesitancy in entering an order. The terms and duration of an order, however, should be tailored to the facts of each case, designed to address the threat of violence and not other Family Law issues not required to be addressed to accomplish that goal. Prior abuse and the nature and severity of abuse may be relevant to certain types of relief. See, *e.g.,* § 4–506(e).

 In our view, the circuit court did not attempt to tailor the order to the perceived harm, thereby inducing the parties to address separation and divorce issues in a separate action, but granted maximum relief for the maximum duration on the ground that it would be "without prejudice." Such an order would almost always have the effect, although unintended by the court, of giving an unfair advantage to a party in a subsequent divorce, support, or custody action. The court should carefully consider the terms and duration of the order to ensure that the resulting prejudice is justified.

Because there is no reason to presume that the trial court applied an objective standard and no indication that the court attempted to tailor the terms and duration of the order to the

---

**2.** It may be sufficient if the offending party knows of a victim's particular susceptibilities and seeks to take advantage of them. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 10, at 44 (5th ed.1984)(discussing assault and stating that "[p]erhaps, however, if the defendant has knowledge of the plaintiff's peculiar and abnormal timidity, and intends to act upon it, there should be a right to recover. . . .").

conduct, we cannot determine the appropriateness of the order. Consequently, we vacate the order and remand to the circuit court with a direction that the circuit court, consistent with this opinion, consider whether an order is now appropriate, and if so, its terms.

**PROTECTIVE ORDER DATED JANUARY 10, 2000, VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**